SKELTON (CITY BANK OF NEW YORK v.). See Cases Nos. 2,739 and 2,740.

## Case No. 12,922.

SKIDDY et al. v. ATLANTIC, M. & O. R. CO.

[3 Hughes, 320.] [1]

Circuit Court, E. D. Virginia. May 9, 1879.

RAILROAD COMPANIES — RECEIVERS — WAGES DUE EMPLOYES—BONDHOLDERS—TRUSTEES—CONSOLIDATION OF ROADS—PARTIES.

1. Wages to employés past due for eight months before the order of court sequestrating the property of a railroad company and appointing receivers, were ordered to be paid to such employés as were retained in the employment of the road by the receivers.

[Cited in McIlhenny v. Binz (Tex. Sup.) 13 S. W. 663.]

2. The court refused to pay similar past due wages of employés, which had been assigned to third persons who petitioned for payment. It also refused to pay for steel rails and supplies furnished before the appointment of receivers on the credit of the company.

3. On petition of complainants that the receivers should be ordered to issue ten-year extension certificates to such holders of matured bonds and past due coupons as were willing to accept them, the court made the order prayed for.

4. The complainants are trustees in a mortgage of $5,500,000, owned almost wholly in England and Holland. These bondholders are respectively represented by a London committee and an Amsterdam committee, with whom bonds are deposited, with powers of attorney. The London committee claim to have given all bondholders notice of their intention to bring this suit, and to represent all; but the Amsterdam committee deny this, and claim to represent $2,000,000 of bonds, and aver that the London committee represent only about $2,000,000. It is certain that the Amsterdam committee represent a very large number of bonds, approximating the amount which they claim to represent. This agency, showing powers of attorney, file a petition setting out grounds for disapproving the trustees' management of the suit, denying that the trustees represent their interests satisfactorily, and praying

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

to be admitted as parties defendant to the suit. Their prayer was denied by the court, the opinion of the circuit judge prevailing; the district judge dissenting from this ruling of the court.

[See Lyon v. Virginia & S. R. Co., Case No. 14,321.]

5. The defendant in this case (the Atlantic, Mississippi and Ohio Railroad Company) was consolidated, under an act of the Virginia legislature, of three other companies, one of which is the Virginia and Tennessee Railroad Company. The process of consolidation authorized was, that shareholders in the divisional companies were allowed to subscribe their stock to the stock of the consolidated company. So nearly all of the stock held in two of the divisional companies was stocked into that of the consolidated company, that those two companies practically went out of existence. But the case was different with the Virginia and Tennessee Company, 3,389 shares in which remain outstanding. The charter of consolidation, in terms, keeps alive the company so long as this stock remains in its present status. Several mortgages executed before consolidation by this Virginia and Tennessee Company remain unsatisfied. The amount and priorities of the debts they secure were part of the subject of reference to a commissioner in this suit, and of the decrees of the court. Parties in interest prayed that this company should be made a party defendant to the suit. The court [was] composed of Chief Justice Waite and Circuit Judge Bond (District Judge Hughes dissenting). *Held,* that this company was not a necessary party defendant, and denied the prayer of the petitioner.

[Cited in Clyde v. Richmond & D. R. Co., 55 Fed. 448.]

In equity. The line of railroad consolidated under the company, which is the defendant in this suit, was originally owned by three several companies. The Norfolk and Petersburg Company owned the road between those cities. The Southside Company owned the road between Petersburg and Lynchburg. The Virginia and Tennessee Company owned the road between Lynchburg and Bristol, a town on the border of Tennessee. There was also a fourth company, chartered for the purpose of extending the line to Cumberland Gap, called the Virginia and Kentucky Company; and this company was also consolidated with the other three by the legislation about to be described; but none of its road was ever completed, and it was afterwards, by later legislation, dropped out of the consolidated company, and its connection with the subject will not be regarded in what follows. By an act of the general assembly of Virginia, passed the 17th June, 1870, the four several railroad companies just named, the lines of the three first of which reached from Norfolk to Bristol, a distance of four hundred and seven miles, were authorized to be consolidated into one company by the name of the Atlantic, Mississippi and Ohio Railroad Company, upon such terms as the stockholders of such company in general meeting might agree upon, but with no power to compel any stockholder in any divisional company to exchange his stock in such company for stock in the consolidated company; each company to retain an existence as such for certain purposes until all its stock should be subscribed by its owners to that of the consolidated company, at such estimate of comparative value as should be agreed upon by the companies in general meeting. The stock held in the Norfolk and Petersburg, and the Southside Companies was virtually all stocked into the Atlantic, Mississippi and Ohio Company. That in the Virginia and Tennessee Company was also all stocked in, except 3389 shares, of the par value of $100 per share. The conditions of the act of charter, of June 17th, 1870, were otherwise fully complied with in general meeting of the companies, and the consolidated company was formed in November, 1870. The remaining facts of the case are recited in the bill of the complainants, the substance of the more material portions of which are as follows:

### Bill of the Complainants.

To the Judges of the Circuit Court of the United States for the Eastern District of Virginia, Fourth Judicial Circuit:

Your orators, Francis Skiddy, William Butler Duncan, and Samuel L. M. Barlow, of the city, county, and state of New York, and citizens respectively of the said state of New York, trustees as hereinafter more particularly set forth, bring this their amended bill against the Atlantic, Mississippi and Ohio Railroad Company, a corporation created, organized, and established under and by virtue of the laws of the state of Virginia, and a citizen of the state of Virginia, George Blow, Jr., Richard H. Chamberlain, George W. Camp, John S. Tucker; the city of Petersburg, John Mann, executor, etc.; Martha Wallace, W. H. I' Lee, and W. N. Bolling, executrix and executors, etc.; Richard G. Pegram, Odin G. Clay, Thomas S. Bocock, Abram S. Hewitt, C. L. Mosby, C. W. Purcell, F. Johnson, R. J. Davis, R. H. Maury, D. H. Miller, trustees, etc.; the board of public works of the state of Virginia, and also specially the state of Virginia, in so far as said state can be made a party, as hereinafter mentioned, or shall elect to come in as a party; and thereupon your orators complain and say:

That, on the 9th day of September, A. D. 1871, the defendant, the Atlantic, Mississippi and Ohio Railroad Company was, and now is, a corporation duly created, organized, and established as aforesaid, under and by virtue of the laws of the state of Virginia, and owning and operating a continuous line of railway from the seaport of Norfolk, in the said state of Virginia, to Bristol, in the state of Tennessee, and having due authority of law to extend the said line to Cumberland Gap, in the state of Kentucky, and did possess due authority of law to execute a mortgage upon its said line of railroad property and franchises, for the sum of fifteen million dollars, to secure the

bonds of the said company, to be issued. negotiated, and sold for the purpose of raising money for the use and benefit of said company. That on the said 9th day of September, A. D. 1871, the said company did execute and deliver to your orators its certain indenture and deed of trust and mortgage, wherein and whereby the said company did convey to your orators, for the consideration and upon the trusts therein fully and at large set forth, all the right, title, and interest of the said company which the said company then possessed, or might thereafter acquire, in and to all and singular its franchises and entire line of railway, constructed or to be constructed, extending from Norfolk, aforesaid, to Cumberland Gap, aforesaid, together with all branches thereof, constructed or to be constructed, together with the tolls, incomes, rents. issues, and profits thereof, and all real estate, rights of way, easements, fixtures. rolling-stock, machinery, tools, and equipments, and all other personal property thereunto belonging; but in and by the said indenture, among other things, it was and is provided and declared that the premises aforesaid were conveyed to your orators to secure the bonds of the said company to the amount, in the aggregate, of fifteen million dollars: that is to say. fifteen thousand bonds of one thousand dollars each, bearing date even with the said indenture, payable in gold coin of the United States, thirty-three years from the said date, with interest coupons thereto attached for the payment of interest thereon semi-annually, at the rate of seven per cent. per annum, in gold coin of the United States, or in British sterling, at the option of the owner.

And for the equal benefit and security of all persons or corporations who might become holders of any of the said bonds, without preference, it was further provided that if default should be made in the payment of any of the interest coupons upon any of said bonds then outstanding on the demand of the bona fide holders of said coupons, representing at least one-fifth of the bonds secured by said indenture, and within ninety days after the said demand, your orators, trustees as aforesaid, should enter upon the mortgaged premises and take possession thereof, receive the rents, tolls, and income thereof, and apply the same as herein provided; and might proceed to sell, upon and after certain notice therein provided for, the mortgaged premises, or so much thereof as might be necessary to raise and produce the amount of money then due by the said company, and in arrear in respect of the said mortgage bonds; and it was further provided, in case of default in the payment of such bonds at maturity and the continuance thereof for the period of ninety days, and upon the demand of the holders of one-fifth in amount of said bonds remaining due at the time, then, if required

by the bona fide holders of one-fifth of the said amount of bonds, your orators, the survivors of them, or their successors, should enter upon the premises and take possession of the entire property, lines of railroad and franchises of the said company, and proceed by their duly appointed agents to conduct the business of the same and control its various receipts and disbursements until the amount of any past due and unpaid principal and interest shall have been duly discharged; or, in their discretion, proceed to sell the premises, or so much thereof as might be necessary, at public auction on certain notice therein provided for, and execute good and sufficient conveyance thereof to the purchasers. That after the execution and delivery of the said indenture to your orators, the said company issued, negotiated, and sold in the open market, bonds of the said issue, to the amount, in the aggregate, of five millions four hundred and seventy thousand dollars, all of which are now outstanding in the hands of bona fide holders. Five millions five hundred thousand dollars additional of the said bonds were deposited by the said company, to be exchanged, under the supervision and direction of your orators, for certain prior mortgage bonds of the said company, then outstanding. $474,000 of such bonds have been issued and so exchanged; and the remainder of the said bonds have not yet been issued by the said company, are under your orators' control, and constitute no lien upon the mortgaged premises. Four thousand additional bonds of the fifteen thousand were authorized to be created for the purpose of extending the line from Bristol to Cumberland Gap, but they were never issued, and the company was released by the legislature from the duty of constructing such extension of road.

The said company continued to pay interest according to the tenor of the said bonds, as it became due and payable. to and inclusive of the first day of October. 1873, on the said five thousand four hundred and seventy bonds so issued. negotiated and sold, as hereinbefore stated. The said company made default in the payment of the interest which became due upon the said bonds on the first day of April, 1874; subsequently the said company paid the interest, which became due on the 1st April, 1874, as aforesaid, one-half of the interest. which became due on the 1st October, 1874, and one-half of the interest on the said bonds which became due on the 1st April, A. D. 1875. It has paid no interest on the said bonds since the date last aforesaid. and all of the interest accruing on the said bonds since the date last aforesaid. as well as one-half the interest thereon due on the first day of October, 1874, and one-half of the interest due April 1st, 1875, now remains due and unpaid.

Your orators are informed and believe that when, and as the interest aforesaid became

due and payable, according to the tenor of the said bonds, payment thereof was duly demanded by the holders, respectively, of interest warrants or coupons; and that if, in case, formal demand was omitted, and such omission was in pursuance of notice on the part of said company that such interest would not be paid. That payment was refused by the said company and its agents; that public notice was given of the inability of the said company to make such payment, and that various negotiations have, from time to time, been had between the said company, its agents and the holders of such bonds and coupons, to the end of inducing such holders to forbear proceeding to enforce the mortgage security therefor, and to grant time and indulgence to the said company for the payment thereof, all of which negotiations have failed.

Your orators further say that the said Atlantic, Mississippi and Ohio Railroad Company was, in pursuance of the said act of the general assembly of the state of Virginia, approved June 17th, 1870, created by the consolidation of the following railroad companies theretofore created and then existing as separate and independent companies, that is to say: The Norfolk and Petersburg Railroad Company, owning and operating a railroad extending from Norfolk to Petersburg. The Southside Railroad Company, owning and operating a railroad extending from said Petersburg to Lynchburg. The Virginia and Tennessee Railroad Company, owning and operating a railroad extending from Lynchburg to Bristol aforesaid. Your orators are informed and believe that prior to the 17th day of June, 1870, and prior to the execution and delivery to your orators of the indenture aforesaid, the property and franchises of the several railroad companies so consolidating, and whose railroads respectively became the property of the said defendant company, and were mortgaged as aforesaid by the defendant company to your orators, had been incumbered by sundry mortgages to sundry persons as security for certain debts of the said companies respectively, and that the said incumbrances, to the extent that they are valid and subsisting liens, are prior in point of time to the lien of the mortgage or deed of trust to your orators. Your orators are informed and believe that the said mortgage debts, in the aggregate, now amount to the sum of about $5,493,008.11, the interest on which is payable semi-annually, and that half-yearly interest thereon, amounting to about the sum of $176,239.18, will become due on the first day of July next; and your orators are informed and believe that the said defendant company does not expect or intend to pay such interest at maturity, and that default in the payment thereof will expose the rights and interests of your orators to great jeopardy.

Your orators pray that it may be ascertained what amount is due, and to whom, in respect of the said several prior liens; and that when ascertained, such order and direction may be given that the foreclosure and sale hereafter prayed for may be made, subject to the lien thereof, upon such terms as may seem to be just and equitable. Your orators say, as they have before said, that they are ignorant of the names of the person or persons to whom the said several prior mortgages or deeds of trust were executed and delivered. And your orators pray that, when discovered, they may have leave to make such person or persons, respectively, parties defendant hereto, if they shall be advised that it is proper or necessary to make them such parties. Your orators are informed and believe, that prior to the execution of the deed of trust aforesaid to your orators, the following deeds of trust or mortgage were executed, delivered, and recorded by the several corporations hereinafter mentioned, owning and operating respectively at the respective dates hereinafter mentioned, part of the premises conveyed to your orators, all of which deeds of trust or mortgage remain of record uncancelled, that is to say. (Here follows a list of the divisional mortgages.) Your orators are informed and believe that the state of Virginia has or claims to have some interest in the mortgaged premises, by way of lien thereon, subsequent, however, and subordinate to the lien created by the aforesaid mortgage or trust deed to your orators. Your orators are informed and believe that this claim is made on behalf of the state of Virginia, under and by virtue of a certain act of the general assembly of the said state, approved June 17th, 1870, entitled "An act to authorize the formation of the Atlantic, Mississippi and Ohio Railroad Company," and under and by virtue of a certain covenant to stand seized, in the nature of a mortgage made to the defendants, the board of public works of the state of Virginia, for the benefit of the state of Virginia, by the said defendant, the Atlantic, Mississippi and Ohio Railroad Company, dated on the 22d day of December, 1870, a copy whereof is annexed hereto in Schedule A, to which said act of the general assembly, and the said covenant to stand seized, your orators crave leave to refer, from time to time, as they may be advised, and as occasion may require, and with like effect in respect of such act of the general assembly as though the same were herein set out at length. Your orators further say, on information and belief, that the said company is indebted to various persons, whose debts are unsecured by any lien upon the mortgaged premises, to an amount exceeding one million dollars, including a large debt for labor to its servants, agents, and operatives employed in the management of its said road, and the conduct of its general business, in an amount, as your orators are informed and believe, exceeding the sum of $195,000, the wages of such persons being unpaid and in arrear, as your orators are in-

formed and believe, for a period of more than six months, and that by reason of such non-payment of wages, if the same shall be continued for any considerable length of time, the mortgaged premises will be in imminent danger of irreparable injury and liable to waste and destruction.

Your orators are further informed and believe that there are sundry judgments against said company outstanding and unsatisfied; but your orators have no information or belief as to the amount thereof, or as to whether such judgments, if any, do or do not constitute a lien upon the mortgaged premises, or any part thereof; and they pray that the facts in this behalf may be ascertained. And your orators, upon their information and belief, further say, that $5.430,000 in amount of the bonds issued under the said mortgage to your orators, commonly called the consolidated mortgage, and which are now outstanding in the hands of bona fide holders, as aforesaid, were issued, negotiated, and sold by the said railroad company, under and upon the faith of the representation of the said railroad company, made through its president to the purchasers and takers of said consolidated bonds; that of the whole issue of $15,000,000 of such consolidated bonds $5,-500,000 were to be specially appropriated to and reserved for taking up the prior mortgage bonds of that aggregate amount upon separate portions of the said railroad line, and which are commonly called the divisional bonds; $4,000,000 were appropriated to and specially reserved for the projected extension of said railroad from Bristol to Cumberland Gap, no part of which has ever been constructed; and the proceeds of the remaining $5,500,000 of such consolidated bonds were to be applied to paying off the entire floating debt of said railroad company then existing, and to repairing, completing, equipping, and putting in full, complete, and suitable condition the entire line of said railroad in the state of Virginia, extending from Norfolk via Petersburg and Lynchburg to Bristol, on or near the state line between Virginia and Tennessee, and that the proceeds of said $5,500,-000 of bonds would be amply sufficient for the fulfilment of all those objects and purposes; and it was then represented by said company to the purchasers of said bonds that the amount of its then floating debt was only about $771,000, exclusive of such as was being temporarily contracted for the purposes of the reparation of said line between Norfolk and Bristol, by way of anticipating the proceeds of such $5,500,000 of bonds while the arrangements for the negotiation thereof were in progress, and to be provided for out of such proceeds when received. And it was then further represented by the said company to the parties to whom the said consolidated bonds were negotiated, that the net income of the said railroad would unquestionably be much more than sufficient to meet all the current interest on the consolidated bonds

which were issued, and upon the prior divisional bonds. (Here follows a financial statement.)

Yet the said company is in default for interest on said consolidated bonds during said period to the extent of some $600,000, besides having made no provision for the large amount of interest falling due on 1st July, 1876, upon the divisional bonds; and in place of having paid off and extinguished their floating debt out of the proceeds of such consolidated bonds, in accordance with their representations and promises, they have, as well as can be judged from their published reports and statements, actually increased the amount of such floating debt. (Here follows a financial statement.) And it is notorious and is given out by the said company itself, that the funds for the payment of the interest on divisional bonds, falling due July 1st, 1876, are not and will not be on hand, and that such interest cannot be paid by the company, and thus in the management of the company and the application of its revenues, since the first day of July last, there has been a misapplication and diversion to the extent of more than $300,000 of the net income of the road from the purposes to which it is pledged by the mortgage deed and to which it ought to have been devoted; and if the road be left in the hands and control of the company, there is imminent danger, and, in fact, substantial certainty, that the like course will be pursued by them in the future. And your orators further show that it is absolutely essential to the protection of the rights and interests of the consolidated mortgage bondholders, as well as for the interest of the public interested in the travel and traffic of said railroad, that the whole line from Norfolk to Bristol should be held together and maintained as one entire property. That by reason of the aforesaid misapplication and diversion of income and the failure of the company to make provision for the interest falling due on the first of July next, on the divisional bonds, there is imminent danger of foreclosures taking place on the divisional mortgages, and a consequent breaking up of the consolidated line, and great sacrifice of the property, rights, and interests of the consolidated bondholders, unless the said railroad be at once taken out of the hands of the company and placed in the hands of a receiver or receivers, so that a proper application of its revenues for the future may be secured, and due order may be taken for the avoidance of foreclosure of the divisional mortgages, either by raising means for the payment of the divisional mortgage interest upon the credit of the property, or otherwise. And your orators further show that the whole of said mortgaged property in its present condition is an insufficient security for the payment of the consolidated mortgage bonds which are outstanding in the hands of bona fide holders as aforesaid, and cannot be expected to produce upon the sale thereof, subject to the divisional mortgages, a sum sufficient to satisfy

said consolidated mortgage bonds now outstanding in the hands of bona fide holders, or to result otherwise than in a large deficiency remaining due thereon. That a sale of a parcel or parcels of the mortgaged property to satisfy only the interest due would be substantially impracticable, because of the existence of the prior mortgage liens thereon, and if the same were practicable, it could not result otherwise than in enormous sacrifice and loss. That a sale in parcels for such purpose of property other than the roadway, stations, and other fixed property, could only be of rolling stock and materials and supplies, thus rendering the future operation of the road and the obtaining of income therefrom impracticable; that a sale for such purpose of a parcel or parcels of the road itself, if at all practicable, would be an immense sacrifice and loss in respect of the value of the property, as a whole, and that if a sale is to be made at all, it must necessarily be of the whole property as an entirety in order to avoid great loss and injury, and, in fact, enormous sacrifice to the parties interested in the sale and its proceeds.

Your orators further say that the said company is insolvent, possessing no property of any considerable value, other than the mortgaged premises; that the mortgaged premises are an entirely inadequate security for the several mortgage liens thereon; and that the current revenues and income of the said road are being diverted and appropriated by the said company to other purposes, and to the payment of other debts than those secured by the indenture to your orators, and by several prior mortgages hereinbefore mentioned; whereas, in fact, the net revenues of the said road are entirely inadequate, as the said company concedes and admits, to the satisfaction of the payment of such current interest as it matures, and the interest on the aforesaid indebtedness secured by mortgage of the premises and the principal thereof as the same becomes payable. Your orators further say that they bring this their bill as trustees aforesaid, in pursuance of the request and demand, as they are informed and believe, of all the holders of bonds secured by the aforesaid mortgage to your orators, now outstanding. Your orators, therefore, pray that a receiver may be appointed of all and singular the mortgaged premises, including all books, papers, and accounts of the said company, relating to the business of the said company, in and about the mortgaged premises, and all choses in action, bills receivable, moneys on hand or in the hands of agents, with the usual authority of receivers, in like cases, to take possession of all the mortgaged premises, books, papers, records, choses in action, bills receivable, moneys on hand or in the possession of agents, with authority to maintain and operate the said road in the usual course of business, and to do all things usual, needful, and proper in that behalf; to receive the tolls, rents, income, and earnings of the mortgaged premises, safely to keep the same, and make such disposition thereof, as he may, from time to time, be ordered and directed by this court. Your orators further pray that the said company, its officers, agents, attorneys, laborers, and servants, and all persons whomsoever, may be strictly commanded and enjoined forthwith, on demand, to surrender to the receiver so appointed all and singular the premises whereof he is appointed receiver. Your orators further pray that the said company, its officers, attorneys, servants, and agents, may be restrained and enjoined from issuing, negotiating, or parting with any of the bonds created under the aforesaid indenture to your orators remaining unissued. And that they may also be enjoined and restrained from in the meantime parting with, disposing of, or surrendering to any person any part of the mortgaged premises, and from applying any money or property, the proceeds or income of the mortgaged premises, to the payment of any antecedent debt, or to any purpose other than the payment of the ordinary current expenses of operating the railroad and managing the business of the company. Your orators further pray that an account may be had and taken of all and singular the liens of every kind upon the mortgaged premises, stating the order and priority thereof, the amount due in respect of each lien, and to whom; and that upon your orators complying with such terms as may be just and equitable, all and singular the mortgaged premises may be adjudged and decreed to be sold, and sold under the aforesaid indenture of mortgage to your orators, subject to all liens that may be prior thereto, and that the same may be sold at such time and in such manner as may be most beneficial to your orators, due regard being had to the rights and interests of all parties having liens upon the premises, and that the several defendants and the state of Virginia may, by such sale, be barred and foreclosed of, and from all equity of redemption, and all other estate, right, interest, lien, or claim of, in, to, or in respect of the said mortgaged premises. And that your orators may have such further and other relief in the premises as the nature of their case shall require, and as to the court may seem meet. Therefore will your honors grant unto your orators the writ of subpoena, etc. (The usual prayer.)

The bill was filed in March, 1876. The defendant company filed an answer. Each party supported their pleadings with affidavits. The hearing on the motion for an injunction and for a receiver was adjourned by consent from time to time, until the 6th June, 1876, when, after full argument by Messrs. W. D. Shipman, Joseph H. Choate and W. W. Macfarland, of New York, for the complainants; and by Messrs. W. J. Robertson, James Alfred Jones, W. W. Cramp, W. W. Gordon, Thomas S. Bocock, Charles S. Stringfellow, and others, representing different interests in defence, the court (Circuit Judge HUGH L. BOND, and District Judge ROBERT W. HUGHES,

sitting) decided that a case had been made in favor of the motion, and announced that two receivers would be appointed, one to be named by the complainants, the other by the defendant company. Accordingly, Charles L. Perkins and Henry Fink were named as receivers in the decree of the court, who gave bond in $100,000 each, the decree providing that each receiver should be responsible only for his own official acts. Legh R. Page was afterwards appointed counsel for the receivers at Richmond.

The following is the material portion of the decree which was entered:

### Decree Awarding an Injunction and Appointing Receivers.

The motion for the appointment of a receiver in this cause having been argued and considered, it is ordered by the court:

First. That Charles L. Perkins, of New York, and Henry Fink, of Lynchburg, Va., be and are hereby appointed joint receivers of all and singular the mortgaged premises specified and described in the deed of trust referred to in the plaintiffs' bill of complaint, including the entire line of railroad therein mentioned, all and singular the franchises, lands, tenements, and hereditaments of the said defendant company, all and singular the books, papers, and records thereof, all and singular the rolling stock, tools, machinery, engines, and all other personal property of every kind and description of the said company.

Second. That the said receivers, before entering upon the performance of their duties as such under this order, do each of them severally execute a bond with sureties to be approved as to form and sufficiency by a judge of this court, and filed with the clerk thereof in the sum of one hundred thousand dollars for the faithful discharge of his duties in the premises.

Third. That upon filing such bond the said receivers proceed to take possession of all and singular the premises whereof they are hereby appointed receivers; that they continue to run and operate the said railroad of the defendant as the same is now operated for the common carriage of freight and passengers, keeping the premises and property, both real and personal, in good condition and repair, to the end that said road may be operated efficiently and with safety to the public; that they as such receivers have authority to employ, pay, and discharge, from time to time, in their discretion, all needful laborers, servants, agents, attorneys, and counsel; to purchase and pay for all needful materials and supplies; to settle and adjust with other roads all traffic balances in the usual course of business; to make from time to time, in their best discretion, all needful and proper traffic arrangements with other roads for the interchange of business; to pay all taxes on the property whereof they are appointed receivers, that may be due and payable, or may become due and payable during this receivership; to prosecute and defend without the further order of this court all existing actions by or against said company; and to defend all actions that may hereafter be brought against the said company or against themselves, as such receivers, by the permission of this court, and to pay the expenses of such prosecution and defence, and also the expenses and disbursements of the plaintiffs, trustees in and about the appointment of the said receivers; to use the name of the said company in the prosecution of all such actions as they may find it proper or necessary in their discretion to bring, maintain, or defend, with full power to compromise, adjust, and settle, in their best discretion, all such actions, suits, or controversies now existing, or that may hereafter arise; to do whatever may be needful and proper to maintain and preserve the corporate organization and franchises of the company until the further order of this court, and to pay and expend such sum, and no more, for that purpose as may be hereafter, on application and hearing, ordered by this court; to redeem any and all securities of the company now pledged as security for loans of money, if any there be, if it shall be for the interest of the trust, hereby reposed in the said receivers so to do, but not otherwise.

Fourth. It is further ordered that as soon as may be, after the said receivers have entered upon the performance of their duties, they make a true, full, and perfect inventory of all and singular the real and personal property of every kind and description whereof they are appointed receivers, and which may come into their possession, and file the same with the clerk of this court, and due notice of such filing to be given to the plaintiffs' solicitors. That the said receivers do keep full, true, and accurate accounts of all and singular their acts and doings in the premises; that they render and file with the clerk of this court such account within ten days after the expiration of every month of their receivership, and serve copies thereof upon the plaintiffs' solicitors, and that they have liberty to pass their accounts from time to time before Matthew F. Pleasants, who is hereby appointed a master for that purpose, on ten days' notice to the plaintiffs' solicitors after the service on them of such copy thereof; that any question which may arise on such accounting be reported to this court for examination and decision, and that such accounting, when from time to time had and completed, shall be final and conclusive upon all parties, unless on due cause shown the same shall, during the pendency of this action, be opened on special application.

Fifth. It is further ordered that all mon-

eys coming into the hands of the said receivers, or either of them, be by them deposited in one or more safe banks of deposit within the state of Virginia, to be approved by this court or a judge thereof, to the joint credit of the receivers, to be thence drawn out on their joint order or on the order of an agent or attorney to be by them agreed upon. It is further ordered that the said receivers, exercising due prudence and caution in the selection thereof, shall not be responsible for the wrongful acts of their servants and agents. It is further ordered that the said receivers shall not, nor shall either of them, in any case incur any personal or individual liabilities in the operation of the said line of railroad, or otherwise in the premises by reason of any act or thing done by them or either of them as receivers, or by their servants, agents, or attorneys, the said receivers respectively acting in good faith and in the exercise of their best discretion, but the mortgaged premises shall nevertheless be chargeable with any judgment which may be established against the receivers in any action brought against them by any person under leave of this court first had and obtained. It is further ordered that the said receivers respectively shall in no case be responsible jointly for the acts of each other, but shall be responsible only severally each one for his own acts.

Sixth. It is further ordered that all applications for interlocutory order or relief in this action by or on behalf of any party thereto, or the receiver therein, shall be made on notice by the moving party to the party or parties of at least ten days, exclusive of the day of service, and on due proof of personal services of notice, unless the notice hereby required be waived in writing.

Seventh. It is further ordered that the said defendant and all persons whatsoever, be and they are hereby strictly commanded and enjoined peacefully to deliver up and surrender to the said receivers all and singular the premises whereof they are hereby appointed receivers under the penalty attaching by law to disobedience. And in the meantime and until the actual taking possession of the said property by the said receivers, it is ordered that the said Atlantic, Mississippi and Ohio Railroad Company, its president, officers, agents, and attorneys, be and they hereby are enjoined and restrained from disposing of or parting with any of the said property, real or personal, except in the payment of the necessary daily expenses of said road, and that the said company forthwith deposit all moneys and available balances now in its possession or control, and which may come into its possession from day to day, except what is needed for the said necessary daily expenses, in the Exchange National Bank of Norfolk, subject to the order of this court in this cause.

HUGH L. BOND, Circuit Judge.
RO. W. HUGHES, District Judge.

The first question of importance which came up for discussion, related to the wages past due and unpaid of the employés of the road. These were in arrears for the period of eight months. Upon argument it was decided that all back wages due to employés then actually in the employment of the company should be paid. The following order was entered on a representation of Receiver Fink that such a measure was necessary to the safe and successful operation of the road, and that he could not be responsible for the consequences of a refusal of it by the court, to the property of the company or the safety of passengers:

Decree for Payment of Past Due Earnings of Employés.

Upon the petition of the receivers heretofore filed in this cause, it is ordered and decreed that the said receivers be, and they are hereby directed to pay, whenever in their judgments such payment is expedient, the arrearages of wages due the employés of defendant company, who have not assigned their claims, beginning with the pay roll for the month of July, 1875. The said payment is to be made according to the pay rolls this day filed with the clerk of this court, and to the persons therein designated. All other questions touching the subject of this order are reserved.                 HUGH L. BOND.
RO. W. HUGHES.

The next question presented was that of paying the holders of assigned labor claims and of certain petitioners who had furnished rails and other material and supplies to the company during a period of a year or more before the appointment of receivers. On this class of claims, after full argument the court rendered the following decision:

[Before WAITE, Circuit Justice, BOND, Circuit Judge, and HUGHES, District Judge.]

BOND, Circuit Judge. There have been filed a large number of petitions in this cause, asking that the receivers be required to pay out of the earnings of the Atlantic, Mississippi and Ohio Railroad, for materials furnished to the company shortly before the appointment of receivers, and for wages due to the employés of the company before the receivers took possession of it. The petition of George Faris is, to be paid the amount of judgment recovered against the company, upon which execution was issued and levied upon personal property belonging to it. We have thought it unnecessary to set out all the petitions, and have selected these as types of the whole. Whatever is the equity of these is the equity of all, and what is done by the court with them will be the disposition of the others. At the time the materials which the petitioners furnished the company were purchased, the railroad corporation was indebted several million of dollars, to secure which indebtedness it had long antecedently executed and recorded a mortgage, pledging its whole property, of every kind and description. This sum of mon-

ey was borrowed and loaned upon the express condition that this mortgage should be so made. When the mortgagees parted with their money they took the precaution to require this security for its repayment. When the parties who now seek payment for the materials furnished to the company by them, parted with their goods to the company, they did not take the precaution to require any security. Were the court now to grant their petition, and out of the mortgaged property pledged to pay a particular debt, pay them, it would substitute the unsecured for the secured debt: If these simple contract debts for goods, furnished on the credit of the company alone, are to be paid before the mortgage debt is paid, they stand on a better footing than the secured debts. If they are to be paid pari passu with the mortgagees, then the mortgage is valueless.

It is suggested that these claims for materials furnished stand in a different position from the general floating or unsecured debts of the company, because the contracts were made just before the commencement of these proceedings, and the material has been used by the receivers. This can make no difference. All material furnished the company, and for which it is indebted and which was not consumed in the use, is now used by the receivers. Whether a debt be an hour or a year old can make no difference in its equity. It stands in the same relation, no matter what its age, to the secured debt of the road. To allow one of these debts to be paid, out of the mortgaged property, is to allow all. That is to say, the unsecured debt would be paid pari passu with the secured debt, and in a court of equity it would come to pass that the only persons who had no security would be those who had taken it.

Certain of these petitions are on the part of former employés of the road to whom wages are due for work done before the receivers were appointed. Some of these claims are presented by the employés and others by their assignees. So far as this case is concerned, there can be no distinction, their equities are the same. It is impossible to discover upon what better footing these claims stand than do those of the material-men. They are simple contract debts of the company. The labor of the employé was bestowed upon the materials furnished, and both labor and goods became the property of the company. There can be no distinction in law or equity between a debt due for labor or for goods sold and delivered. But in order to set up some sort of equity in this behalf, it has been argued that the mortgagees had a right to take possession of the road so soon as default was made in their mortgage, and that not having done so, they suffered the defendant company to contract these obligations, which were for their benefit. It has never been decided yet that because a mortgagee does not immediately pounce upon his security, foreclose,

take possession, and sell, that he impairs the obligation of his lien. If a man have a mortgage on a large stock of goods of a retail merchant, and default is made, it will hardly be contended that unless possession is at once taken the lien for wages of the mortgagees, clerks, and employés is superior to the mortgage.

These petitions present cases of great hardship, but the contract for hire was with the company, not with these mortgagees, and these claimants are entitled to be paid, as are the material-men, out of anything the company has unmortgaged. There was, at the time of these contracts for labor and material, no law of Virginia giving a statutory lien. The only lien pretended to be set up is an alleged equitable one. That the opinion of the legislature was that no such lien existed is plain, from the fact that by the recent act of March 21, 1877 (chapter 200), an effort has been made to give such a lien as that set up in these petitions. Like that of George Faris, the executions in these cases were levied upon mortgaged property. The creditor is entitled to whatever interest may result to the company after the mortgage debt upon the road or the locomotive taken in execution is paid. He is entitled to nothing more. When these proceedings are matured, the assets of the company will be marshalled and sold, the liens and priorities of creditors ascertained, and the proceeds of sale will be distributed according to the rules of equity, among such as have proved their debts. These petitioners must await that event.

In the course of events, the complainants filed a petition asking that leave be granted the receivers to issue receivers' ten years' extension certificates to such holders of bonds and coupons as had matured, or as would soon fall due, where the holders should be willing to receive them. This petition was heard at Norfolk in November, 1877; and the following was the decision of the court, rendered soon after, in granting the leave prayed for:

### Receivers' Certificates.

On the complainants' petition for leave to the receivers to accept and provide for an extension of time for paying certain obligations of the defendant to creditors desiring to forbear the collection of the principal sums due them.

This petition was, after due notice to counsel of other parties in interest, brought on for hearing, and argued on the 24th inst. The decision of the court is now delivered as follows, by—

HUGHES, District Judge. The circuit judge was willing at once to sign the order asked for by the complainants on the 24th inst.; but we concurred in thinking it well to take a few days for consideration, and I am now ready to state the grounds of the action of the court.

The petition of the trustees of the consolidated mortgage sets forth that certain bonds secured by certain mortgages on the divisional roads of the defendant company, and amounting in the aggregate to $866,944, are past due, or will soon mature; and that the holders of a large portion of them are content to forbear the payment of the principal so due, and would do so if relieved from the necessity, when collecting the semi-annual interest accruing and to accrue, of transmitting their bonds to the places of paying interest, and having each payment indorsed upon the bonds. The petition, therefore, asks, as a convenient means of making and evidencing these payments. that the receivers be allowed to prepare coupons for the payment of future interest, to be attached to such bonds as may be held by persons willing to forbear the collection of the principal due them, and to continue to receive the semi-annual interest which their bonds now carry.

The class of bonds and obligations past due or soon to fall due, to which the petition refers, are as follows:

$157,000 of the 7 per cent. first mortgage bonds of the Norfolk and Petersburg road which were due in 1868, and were extended to 1875. and

306,000 of the 8 per cent. first mortgage bonds of said road which were due in 1868 and were extended to 1877—the two making $463,000 of first mortgage bonds of that road, past due.

5,000 of 6 per cent. first mortgage bonds of the Virginia and Tennessee road due since December, 1872.

260,500 of 8 per cent. bonds, called "interest funding bonds," issued to Decatur H. Miller, December, 1869. to take up and extend coupons of the Virginia and Tennessee road then due, and secured by deed of trust on that road.

138,444 of 8 per cent. bonds issued in December, 1873. by the consolidated company in extension of the time of paying certain coupons of the several divisional roads then about falling due, the unpaid coupons standing as a pledge for the security of these bonds issued in their stead, which will fall due January, 1879.

$866,944 being the total amount of the bonds to which the petition refers.

The allegations of the petitioning trustees are that "the holders of a large proportion of the said liabilities are willing to extend the time for the payment of the said principal;" and that "the interest of all parties will be promoted by an order of court authorizing and directing the receivers to prepare and issue to such holders of said obligations, as are or may hereafter be willing to receive them," such certificates as are described in the petition. It will be observed that the extension contemplated is but a repetition of what was done during the defendant company's regime on frequent occasions, without objection from any source, and to the common advantage of all parties interested.

No objection is made to the prayer of the petition by .any class of bondholders, a large number of whom are represented to be in favor of the arrangement. The bondholders are the only persons substantially interested in the proposal, and are the class who are naturally most intelligent, alert, and sensitive on the subject. The only objection comes from certain of the trustees of mortgages resting on the divisional roads, especially the trustees under the first and second mortgages of the Norfolk and Petersburg road. But the interest of trustees, in such a question as this, is merely nominal, and their powers but little more than perfunctory. Under a proper sense of the responsibility of their position it is perfectly competent for them to file formal objections to the prayer of the petition; and submit the whole matter to the judgment, and discretion of the court. This, it was no doubt, their duty to do, and they have performed that duty; but, as the question presented to the court is more one of interest and of policy than of law, if the bondholders, who are the persons really interested in the proposal, consent, and no shareholder objects, the court would be slow to thwart the wishes of the former, at the instance of trustees having no substantial interest, and who are but formal parties to the record.

If any of the divisional bondholders desire to forbear the collection of the principal of their bonds, why should they be required by their trustees to foreclose? If, in forbearing, they desire a convenient and usual process of collecting the instalments of interest due them to be provided, then, what right have their trustees to object? If this road were still in the hands of its company there could be no doubt of the right and power of the company (a right which it frequently exercised) to extend the time of paying such bondholders as were willing to forbear, and to devise a convenient means whereby such bondholders could collect and make receipt for the semi-annual interest falling and to fall due. And but for the fact that this road is in the hands of receivers, who are the servants of the court, and can do nothing except by its authority, this petition would be unnecessary. It has been presented out of abundant prudence; and its prayer is simply that the receivers may have leave to adopt a convenient and usual means of enabling those bondholders, who wish to forbear the collection of the principal due them, to collect and give receipt for the interest as it shall fall due. The coupons proposed by the trustees are to cover semi-annual instalments of interest for ten years; with the proviso (to be embodied in them) that they are to be delivered up whenever they shall be called in, either by the receivers or by any company succeeding to them in the control of the road. The bondholders who apply for them will be bound to an extension, for ten years, of the time for demanding the principal of their bonds. But the receivers, and the company succeeding to them, will be bound to no time of extension at all, and indeed nothing at all, except the payment of such instalments of interest as shall fall

due while the coupon certificates proposed shall be outstanding. No change of securities or of the rights of any party in interest can be effected by the proposition in any degree; except only, that the bondholders who choose, will be allowed to relinquish for a time their right to the immediate payment of the principal of their bonds.

As there can be no change in the rights of parties, except such as those bondholders who choose may voluntarily submit to, the only question for the consideration of the court is, whether it is for the interest of all concerned to permit the transaction proposed. The effect of the transaction will be to satisfy those bondholders who have a present right to the immediate foreclosure of certain divisional mortgages resting upon parts of the line of the Atlantic, Mississippi and Ohio road by a separate sale of those divisional roads. By satisfying them the court will diminish, and, I trust, remove, the danger of separate sales of parts of the line, and prepare the way for a sale of the road as an entirety. The court feels bound to employ every means in its power and within the scope of its jurisdiction, to prevent any disintegration of the line. Its custody of the road has not so far been prejudicial to any interest connected with it. Leaving out of view such injury as may have been caused by the floods of the last week, the road is in better condition than ever before, while the floating debt left by the company has been diminished. During the custody and management of its receivers the bonds secured upon the divisional roads have in every instance appreciated very materially, if the court may be presumed to take note of the quotations of the markets as made known by the public prints. The bonds of the second mortgage on the Norfolk and Petersburg division have appreciated since June, 1876, from sixty-eight cents in the dollar to seventy-eight cents. The bonds of the first mortgage of the Norfolk and Petersburg divisional road have appreciated since June, 1876, from about eighty-six cents in the dollar to about ninety cents. Certain other of the bonds secured on divisional roads have risen as much as thirty cents in the dollar since June, 1876, when the receivers took charge of the consolidated line. It is also true that there has been no depreciation in market value during this period of any class of bonds secured on the divisional roads. The court, therefore, being aware of these facts, does not consider that it acts to the prejudice of any party in interest in adopting any measure tending to prevent and avoid the separate sale of any division of the road in foreclosure of divisional mortgages, whereby it may insure a sale of the line as an entirety. It feels bound to pursue a policy looking to the preservation of the integrity of the road from Norfolk to Bristol, by many considerations. If the line were broken into several parts each would be comparatively valueless. The experience of all railroad management, in this country and elsewhere, is, that lines of road broken into parts under disjointed management, cannot be conducted with economy, efficiency, or success; and are incompetent to compete with rival lines for the business of the country. If the Atlantic, Mississippi and Ohio Railroad were broken at Lynchburg, in its ownership and management, the roads east of that point having little travel, would be reduced in their business to a very diminutive local trade, and, if sold with their feeble revenues, would not pay the mortgages resting upon them. If the road from Lynchburg to Bristol were detached from the line, in ownership and management, it would cease to be a part of a great avenue for the heavy products of the Western country, and would be dependent for its chief resources upon travel and light express freight, which it would carry as part of a north and south line. Running through a mountain region, it would speedily become under the heavy expenses constantly necessary to maintain it, as feeble in its revenues and resources, as when it was first consolidated in management with the roads to Norfolk.

As a consolidated line of east and west transportation for the trade of the West, this line of road has been growing in importance and public consideration more and more each year, ever since its consolidation. Western trade, the first avenue of outlet for which was the Erie Canal, and which afterwards sought the lines of road constructed parallel and near to that work, has been tending for several years to lines on lower latitudes and shorter routes. The large business of the Baltimore and Ohio road is a striking exemplification of this tendency. The growing magnitude of the business of the Chesapeake and Ohio Railroad is another evidence of the strong tendency of Western trade to avoid frost and long lines, in favor of more southern and shorter lines. The present great and growing business of the Atlantic, Mississippi and Ohio road is a further and conclusive proof that Western trade is seeking the shortest lines across the continent to the Atlantic ports. Whether Western produce seeks to reach the Atlantic seaboard from Memphis, or St. Louis, or Louisville, or Omaha, or Chicago, the line of the Atlantic, Mississippi and Ohio road presents the shortest, and with some inconsiderable expenditure on parts not yet completed, can be made the most eligible of all the great east and west lines of railway, except probably that of the Chesapeake and Ohio road. It has the advantage of resting upon tide-water in the East, near the foot of Chesapeake Bay, whose outlet to the ocean is on the same latitude vis-a-vis with the straits of Gibraltar, and of terminating at the first safe port north of the dangerous Carolina coast. Its western terminus at Bristol is a converging point for lines of railroad coming up from all parts of the Southern and Southwestern states, and from the Mississippi at Memphis and St. Louis. With a small expenditure in the direction of Cumberland Gap or of New river, Bristol or

Central Depot would become the focus also of lines of railway pointing from Louisville, Cincinnati, Omaha, and Chicago, to the seaboard. When a saving of 200 miles in distance is continually offered to the trade of a vast region of country, local influences and artificial contrivances cannot, for any very long period of time, prevent it from seeking the shorter routes. The prorating distance from Norfolk by sail vessels to Liverpool being only 500 miles, and to New York only 75 miles, and by steamers to Liverpool only 1,000 miles, and to New York only 125 miles, this tendency of trade to find outlet to the ocean by way of Norfolk over the Atlantic, Mississippi and Ohio road from beyond Bristol must continually strenghten, unless unfortunately the road should be broken into parts.

The disintegration of the line of the Atlantic, Mississippi and Ohio road at Lynchburg would be fatal to its value as an east and west avenue of produce moving to market from the West and Southwest, and of merchandise returning to those regions from the East, the North, and Europe. The Virginia and Tennessee division would degenerate into a mere road of rapid transportation for light goods and passengers between North and South. The Southside and the Norfolk and Petersburg divisions would lose their present through trade from the Western and Southwestern states, and speedily degenerate into the unimportant local works which they were within the memories of persons not yet of matured age. Paramount, however, to the mere pecuniary interests of the bondholders and shareholders in this line of road and its several divisions, are the public interests connected with it. The court is not unmindful of the fact that the commonwealth of Virginia, in bestowing an expenditure of seven or eight millions of dollars upon the roads constituting this line, intended them to be more than local works, and especially intended that the Virginia and Tennessee road should be more than part of a line of north and south transportation for travel and light freights. This character of road was scarcely within the contemplation of the state. Her intention was to construct a line of east and west transportation that would bring the staple products of the Northwest, the West and Southwest across her territory to her principal cities, and at Richmond and Norfolk would place her merchants in connection with the large commercial operations of the world. The court keeps constantly in view this cardinal policy of Virginia, and has every assurance that the foreign bondholders are desirous to pursue, advance, secure, and render permanent this policy. As far as it lies within its jurisdiction, and as it may be done within the scope of its proper functions and may not impair the rights of parties in interest, the court will discourage separate accounts and separate sales of foreclosure in this suit; in order that, after disposing of the many interlocutory motions and petitions before it, it may enter a decree in foreclosure directing a sale of the whole line as one work under which this line of road may be rendered permanently intact and indissoluble. An order of court is, therefore, entered in accordance with the prayer of this petition.

### The Dutch Bondholders' Petition.

The five-and-a-half million loan is held in nearly equal proportions by English and Dutch bondholders. The interests of each of these classes of creditors are in charge of a committee, respectively styled the "London Committee," and the "Amsterdam Committee." The complainants (the trustees in this suit) are thought by the Dutch to recognize only the English committee, and to act exclusively in sympathy with the English bondholders. The Dutch committee, accordingly, filed a petition in 1878, praying to be made formal parties defendant of record.

After full argument of the petition, in which the counsel for the complainants made earnest and strenuous resistance to the prayer of the petition, and after hearing the counsel for the Dutch bondholders (Mr. Ashbel Green and Samuel L. Parrish, of New York, and W. W. Henry, of Richmond), the court decided as follows, the opinion of Judge BOND prevailing, as the law of the case:

### Parrish v. Skiddy, Duncan, and Barlow.

BOND, Circuit Judge. The defendants of record in this cause on the 9th day of September, 1871, executed a mortgage of their railroad and effects to the complainants to secure the payment of certain bonds mentioned therein and the interest thereon as it fell due. There was default in the interest, and the complainants, the mortgagees, brought suit to foreclose the mortgage. Everything has proceeded regularly from time to time without complaint on the part of the cestui que trusts under the mortgage until the filing of the petition now under consideration, which is a petition by certain of the bondholders alleging that they should be made parties to the suit. The reasons given for this request are:

1st. That the petitioners are a committee known as the "Amsterdam Committee" for the protection of the rights of the consolidated bondholders of the defendant company, by which is meant that they are bondholders under the mortgage to the complainants or their representatives. The petition then alleges that these proceedings on the part of the trustees were commenced by a minority of the bondholders, but it does not seek on that account to dismiss them, nor does it allege that the proceedings were taken against their objections or wishes. They allege that for the protection of their interests they have appointed counsel to represent them in this country, and that they hold one-half of the bonds, or nearly so, under the mortgage above mentioned, and that not being parties to the

suit upon record, they do not receive notice of the proceedings as they go on from the trustees or their counsel, and they pray that they may be made parties to the suit in order that they may take part in the proceedings in the cause as it progresses from time to time. This petition was filed on the 21st of December, 1877, and was signed by James C. Parrish, who was not alleged in it to be a bondholder nor the counsel for any such in this court.

Upon April 4th, 1878, another petition was filed, amending the first, already referred to. In this amended petition it is alleged, first, that certain proceedings have been had heretofore between the bondholders represented by a committee of the Amsterdam committee, with a like body representing English bondholders at London, and after a long recital of interviews between the parties of bondholders, the one in England and the other in Amsterdam, respecting the reorganization of the defendant company, it states that they could not agree upon a plan for such reorganization, and that the English bondholders had the aid of the counsel of the complainants in drawing up and advocating their plan of reorganization, in opposition to that of the German bondholders; and it further alleges that the English bondholders, through their agent, had advertised that their plan of reorganization had the approval of the receivers of the road and of the counsel of the trustees of the mortgage, the complainants in this suit. It is alleged that the agent of these European bondholders applied to the trustees under the mortgage to be supplied with copies of the papers filed from time to time in the cause, and that they have not done so, and have refused so to do. And it is charged that the trustees are carrying on the suit in furtherance of the plans of the English bondholders without reference to those of the German bondholders or their committee, and the prayer is that they may be made parties to the suit. It is nowhere alleged in this petition, original or amended, that the trustees or their counsel, so far as this suit has progressed, have not acted for the benefit of all the bondholders under the mortgage without partiality or prejudice. No single act of the trustees in the conduct of the suit is referred to as detrimental, or in antagonism to the interest of the petitioners. Nor is the court asked, on account of their negligence, fraud, or incompetency, to remove them and give to the petitioners or the bondholders the conduct of the suit.

The sole objection is that among the bondholders themselves there has arisen a dispute respecting the reorganization of the defendant company, and that the trustees or their counsel have, in consultation with such bondholders as they have had access to, given preference to the plan of one party of the bondholders rather than to that of the other. No allegation is made, however, that this preference has been expressed in any proceedings taken in court, or that it has influenced in any way the conduct of the suit on the part of the trustees.

Of course in every cause in equity all the parties in interest must be made parties to the suit, but in the case of Richards v. Chesapeake & O. R. Co. [Case No. 11,771], this court has already held that to foreclose a mortgage given by a railroad company to trustees to secure the payment of bonds and coupons mentioned in it, as they mature, the trustees are the only necessary parties to the suit; that the proper parties to be defendants are the parties who hold or claim in opposition to them, is equally clear. In order, therefore, to disturb the rights of the trustees to bring and conduct this suit, in which they represent every bondholder known to the mortgage, at the instance of such a bondholder, it must be shown to the court that the trustees have done, or contemplate doing, in the cause some act which will be detrimental to the interest of such bondholder or set of bondholders. This is not averred or proved in the matter of this petition. It is alleged that the trustees have approved a plan of reorganization proposed by one set of bondholders rather than another. But the court cannot consider any proceedings among the bondholders or trustees which are not the subject of proceedings in this court and this cause, so that until it is proved, as it is not now asserted, that the trustees under this mortgage, ought not, by reason of negligence, fraud, or incompetency, to conduct this suit, the petitioners have no right to ask that they be appointed plaintiffs to share in such conduct, or to conduct it wholly themselves. I know of no instance in a case of foreclosure of a railroad mortgage where the trustees have been displaced or required to take an adjutant bondholder to assist in the conduct of a suit, except where some malfeasance or incompetency is alleged on the part of the trustee. But the petitioners ask in the petition, as amended, at once to be made parties, whether plaintiff or defendant, and cite numerous instances where the courts have allowed bondholders of different interests or classes, who though represented by the same parties, had or thought they had, different interests to be defended or asserted, from others represented under the same mortgage or deed of trust. It seems to me none of these cases apply to the matter of this petition. There is but one class of bondholders under this mortgage. The interests of each bondholder are identical. Some of the bondholders have moved the action of the trustees and others have not. The one are active bondholders and the others are inactive. Some of them are represented by one committee and others are represented by another, but this does not constitute a class of bondholders; their interests are identical, and one might as well say that because bondholders under the same mortgage were represented in court by different counsel, that constituted them a

different class of bondholders, and that they were, because represented by different persons, entitled to be parties to the suit.

The moment a petition is presented to this court by any party interested in the conduct or result of this suit, which alleges that these trustees are derelict, incompetent, or partial in any action they propose to the court, that petition shall be, as it is entitled to be, respectfully heard, and if after consideration of the proof it shall be ascertained that the petitioner is correct the trustees will be removed, and the bondholders allowed to conduct the suit in their own way without the intervention of trustees, except so far as they may be nominal parties to it. And these petitioners who now ask to be made parties, plaintiffs or defendants, while we refuse them the conduct of the suit or to be made parties to it, are at liberty, whenever a motion is made in this cause which in their judgment is hostile to the interests of their clients, to oppose it, as they have done in this instance, by petition; if the circumstances show bad faith on the part of the trustees, they will be removed and others appointed to conduct the suit. This serves all the purposes of this petition, except that the bondholders represented, or alleged to be represented by the signers of it, may not have the right of appeal from any decree of the court which they think unfavorable to their specific and personal interests, unless made parties to the record. Under those circumstances, when they arise, we think any bondholder who feels that his rights are injured by the action of the trustees or of the court has a right to be put in such position, either as plaintiff or defendant, as will enable him to have them adjudicated by an appellate court. That case is not presented to us by this petition, and the prayer of it is therefore in this instance refused.

Judge HUGHES differed, in the following opinion:

HUGHES, District Judge. I have differed so seldom with the presiding judge (whose opinion is the law of the court) that it is with great reluctance that I now express a dissent from his ruling. In the result at which he arrives, in the decision just read, I concur substantially, as the petitioners can gain all they now desire, under the ruling of the court. I think that the bondholders who did not unite in directing the trustees to move in this cause for foreclosure, may of mere right be made parties defendant.

In considering the petition of the Dutch bondholders, I have been content to confine my view to the terms of the trust deed securing the bonds of the consolidated company. A provision of that deed authorizes the trustees to proceed for foreclosure at the direction of one-fifth of the bondholders secured. It thereby classifies these bondholders into those who move in the suit and those who fail or refuse to move. It has never appeared affirmatively in this cause how many of the bondholders united in instructing the trustees to proceed for foreclosure. That question, I believe, went by default at the commencement of the suit, which began (before suit was entered) with a consent order for the appointment of two receivers. This consent was afterwards withdrawn. It now appears that the holders of about two millions of the bonds are represented by the trustees; that the holders of another two millions are not in sympathy with the trustees, and are here petitioning for a standing in court with a view to looking after their own interests; and that the holders of still another million and a half of bonds are taking no part in the proceeding one way or the other. Thus the petitioners are neither actually nor presumptively complainants in this cause. Inasmuch as the trust deed itself classifies the bondholders into those by whose instructions the trustees are acting, and those who may see reason to dissent from that action; and inasmuch as actual objection to the policy of the trustees is made by the holders of the imposing amount of two millions of bonds, it seems to me that the court is bound to recognize the classification of bondholders made by the deed itself, and, of mere right, to let into the cause, in the person or persons of some authorized representative, as parties defendant, in the manner prescribed by rule 48 in equity, the petitioners for the Dutch bondholders. I should prefer that this should be done, and I have no doubt the petitioners themselves would prefer it to be done, under their original petition, in which they pray to be admitted as of mere right. This would relieve them from the necessity, which is doubtless an unpleasant one, of formally arraigning the trustees before the court for any sort of dereliction; and I suppose, if they were allowed, they would withdraw their amended petition and stand upon the mere right of being parties to the cause of the class contemplated by the trust deed, who did not move as plaintiffs, and who are not in sympathy with the policy of the trustees. None but those bondholders who gave instructions to the trustees to proceed for foreclosure are technically or theoretically complainants in this cause; and I see no technical irregularity and no violation of the theoretical or logical proprieties of equity practice in allowing to a large class of interested persons who, under the terms of the trust deed, cannot be presumed to be represented by the trustees or to be parties complainant in this suit, either in law or fact, a standing in court, as parties defendant.

### The Stewart Petition.

One of the most important questions which arose in the case was that presented by the petition of D. K. Stewart, and which is fully exhibited and discussed in the following

opinion of Judge HUGHES. Judge BOND differed on the law involved, but it was so desirable that a conclusion should be reached that should not involve a certificate of divided opinion to the supreme court, that Judge BOND requested the opinion of Chief Justice WAITE, who was present when the question came on for decision. On full conference the Chief Justice concurred in opinion with Judge HUGHES. Judge BOND yielded his own opinion and the decree of the court was entered on that basis, Judge BOND signing the decree along with Judge HUGHES. The following opinion had been prepared by Judge HUGHES before this conference, and furnishes the reasons on which his own opinion was based. It is not to be accepted as embodying the reasons of Chief Justice WAITE, and of course does not express the opinions of Judge BOND.

HUGHES, District Judge. The two statements of agreed facts show the following case: In 1854 the board of directors of the Virginia and Tennessee Railroad passed a resolution authorizing the issue of stock, to be called "preferred stock," interest (not dividends) on which was agreed to be paid regularly, and was agreed to be a lien, or liability of the company, next in grade to the second mortgage bonds, and to take precedence of all indebtedness subsequent to the date of the resolution. The stock was issued and bought with that understanding, but no mortgage or trust-deed was executed for the sole purpose of creating this lien. Afterwards, in 1855, the company executed a mortgage, known as the income mortgage, in which the prior lien of the interest on this stock was recognized and protected. Again, just before the execution of the mortgage to the foreign bondholders, John Collinson, their attorney in fact, issued a prospectus setting forth the debts of the company that would be superior to the said mortgage, and naming the annual interest on this stock among them.

Just after the war, in 1866, the principal of a great deal of the debts of the company became due. Crippled as it had been by the war, the company was unable to meet these obligations at the time, and consequenty proceeded to fund them in new bonds at 8 per cent. interest. But for amounts under $1,000 it issued certificates bearing interest at the same rate. A great many coupons for interest past due, on the several mortgages of the road, were also funded in certificates of the same character. In no instance did the company require those who bought these certificates to waive the mortgage lien, nor did the company require them to accept these certificates in absolute payment of the coupons, etc., funded. In the prospectus of Mr. Collinson, mentioned above, these certificates were named as one of the debts superior in dignity to the mortgage bondholders, and the plaintiffs' trus-

tees, by buying in a lot of them for the benefit of their cestui que trusts, paying in exchange therefor bonds secured by the mortgage to them, recognized their priority. The questions to be considered, therefore, are (a) whether the interest on the preferred stock ever was a lien? (b) whether, if a lien as between the original parties, the trustees and their cestui que trusts, have had sufficient notice, actual or constructive, to make it a lien as against them? (c) whether the acceptance of these certificates operated a waiver or satisfaction of the bonds, etc., which were surrendered in exchange for them? I will consider these questions in their order.

I have no difficulty in holding that the mode in which this preferred stock was issued created a lien as between the parties thereto. They were issued with the declaration that they were a lien; they were bought on the faith of that representation. A court of equity will raise equitable liens for the purpose of justice, and if a lien could not be created otherwise, could even make the company execute a conveyance for that purpose. But it is not necessary. A court of equity considers that as done which ought to be done in order more fully to effectuate the intention of the parties. It will, therefore, consider that as a lien which was so intended to be by the parties. And it will do so with special readiness in this instance, where it has been recognized and treated as such without dispute by all parties for more than twenty years.

I therefore pass to the consideration of the question whether it was a valid equity as against the mortgage to the plaintiffs' trustees. If they take with notice of the equity decided above to exist, they take subject to it. Of course it is not necessary that the holder of every bond secured by that mortgage shall have notice. Notice to their agents, the trustees, and John Collinson, is notice to them. I hold that not only their agents had notice, but that probably they themselves had sufficient notice at least to put them on inquiry. This notice was given: (1) By the income mortgage, a deed duly executed and recorded. That deed expressly recognizes the lien and the priority of the lien of this preferred stock. It is recognized in terms which admit of no ambiguity. (2) By the prospectus issued by John Collinson, their agent. This was widely circulated, and doubtless no one bought these bonds without reading it. And actual notice given in this manner is as effective as if given in any other. (3) The 14th section of the act of incorporation of the Atlantic, Mississippi and Ohio Railroad, providing for the classification, etc., of the debts and stock of the divisional roads, was itself calculated to apprise subsequent incumbrancers of the existence of those debts, etc., and to put them on in-

quiry in protection of their own interests. I therefore hold that the interest on this preferred stock is a liability of the company next in dignity to the second mortgage bonds of the Virginia and Tennessee Railroad, and superior in dignity and valid against the lien created by the mortgage to the plaintiffs' trustees. Nor have I any more hesitation in deciding in favor of the priority of lien of the registered certificates. I see nothing to show that a novation was contemplated by either party. A novation can only arise in pursuance of an agreement express or implied. A contract of such a character must be clearly proved, and the burden of proving it is on the one who alleges it. An intention on both sides to enter into such a contract must be proved.

There is no proof of such an intention in this case. That it was not intended by the company is shown by the resolution authorizing the perpetuation of the mortgage lien on the face of the certificates. And surely it cannot be held that such was the intention of those who received these certificates, when they were neither expected nor required to waive their lien. It cannot be held that they waived it voluntarily. It is well-settled law that the acceptance of different or additional evidences of debt is not a satisfaction of the former evidence or security, unless it is clearly shown to have been so intended. A debt is not paid by taking a note for it, nor is a mortgage paid by taking a certificate of indebtedness. A party may receive as many different securities for the same debt as he pleases, and the law will not hold that he waived his former securities unless it is clearly proved that he did so, and intended to do so. Those therefore, who claim that these registered certificates were an absolute satisfaction of the mortgage lien to that extent must prove that it was so intended. There is no such proof in this case. On the contrary, everything points to the opposite conclusion. The purpose for which these certificates were issued is plain. At the time the interest or parts of the principal so funded became due, the company could not meet their payment. It wanted time, and in consideration of the time thereby granted, it increased the rate of interest, and funded interest as principal. Their consideration, therefore, was not the waiver of their lien. It was the additional time thereby granted. That, it is settled, is a sufficient legal consideration. Such funding operations are of daily occurrence. The Miller covenant was of a similar nature, and since the appointment of the receivers, in the fall of 1877, they obtained leave of court to issue somewhat similar certificates extending the time of payment of some of the divisional mortgages. Until this proceeding, these certificates have always been treated as liens. They were stated to be such by Mr. Collinson in his prospectus; they were recognized

as such by the trustees themselves. Unless on the supposition that these certificates were a lien superior to their own mortgage, the trustees would hardly have bought in $40,000 of them, and surrendered in exchange for them an equal proportion of their own bonds. I, therefore, hold that their lien is not lost, and that they are of the same dignity as the interest coupons, etc., in exchange for which they were issued. Nor can I help feeling that the resistance of the prayer of their petition places the complainants in the attitude of bad faith to the petitioners.

The hearing of the foregoing matter was at the same term of the court at which a motion for a decree of foreclosure and sale was to be passed upon.

### The Virginia and Tennessee Company.

A petition was presented at this term by the agents and counsel of the Dutch bondholders, praying that, before entering a decree of foreclosure and sale, the complainants should be required to make the president and directors of the Virginia and Tennessee Company a party defendant. The facts upon which this petition was based appear in the following opinion of Judge HUGHES on that subject, and need not be set out here. Judge BOND was opposed to the prayer of the petition on the ground that the company named was neither a necessary nor a proper party defendant to the cause. Chief Justice WAITE thought that the company was not a necessary party; and so the decision of the court was against the prayer of the petition. But Judge HUGHES thought the company named a necessary party, and filed the following opinion on the subject [page 290].

### The Petition of Graham's Executors et al.

David Graham's executors, and others, owners of $24,800 of the old stock of the Virginia and Tennessee Railroad Company, suing for themselves and all other stockholders other than the Atlantic, Mississippi and Ohio Railroad Company (owning together about 3,389 shares), petitioned the United States court for leave to make the receivers, Charles T. Perkins and Henry Fink, parties defendant to a suit in equity, which said petitioners proposed to bring in the circuit court of the city of Richmond. They filed with their petition as part thereof, a copy of the proposed bill. In it they allege (among many other things) that the Atlantic, Mississippi and Ohio Railroad Company is, like themselves, only a stockholder in the Virginia and Tennessee Railroad Company, though owning a large majority of the stock, say 31,611 shares out of 35,000 shares, the chartered limit of the capital. They allege that the Atlantic, Mississippi and Ohio Railroad Company has never acquired in

any manner, any right or title to the railroad, the property or the franchises of the Virginia and Tennessee Company, and that the possession of the same by the president and directors of the Atlantic, Mississippi and Ohio Company was an unlawful usurpation. They insist that the deed of 9th September, 1871, the mortgage under which the plaintiffs claim, if valid, is operative only to convey the 31,611 shares of the capital stock of the Virginia and Tennessee Railroad Company owned and held by the Atlantic, Mississippi and Ohio Company. The proposed bill makes the plaintiffs in this suit the board of public works, the commonwealth of Virginia, the trustees in all of the Virginia and Tennessee deeds, the president and directors of the Virginia and Tennessee Railroad Company, and the Virginia and Tennessee Railroad Company itself, in its corporate name and character, parties defendant, and prays relief in the state court according to the facts stated.

The argument on the petition was heard at Norfolk, on Wednesday, May 7th, 1879. The court, composed at the time of WAITE, Chief Justice, and BOND, Judge, for the purpose of passing upon this question, denied the prayer of the petitioners. The Chief Justice from the bench said in substance: That there was no reason why Graham's executors et al. should not, if so advised, bring their suit in the state court against the plaintiffs here, and against the Atlantic, Mississippi and Ohio Railroad Company, and all other parties interested, and assert therein any right they may have in the premises. That these petitioners, not being parties here, could not be barred or affected by any proceeding or decree in this suit. That this court could only sell such estate in the premises as the Atlantic, Mississippi and Ohio Railroad Company actually owned, and by deed lawfully conveyed to the plaintiffs. That the purchaser at a sale made by this court would buy subject to all the rights of Graham's executors and others (whatever they may be), and that they, by supplemental and amended bill, might make the purchaser, whenever he came into being, a party defendant in their suit in the state court, and litigate their rights with him there. That it was neither necessary nor proper to make the receivers parties to any such contention. That they neither claim nor have any title to or interest in the subject-matter. They are merely the servants of this court; the hands with which the court preserves and manages the property pendente lite, and they must not be interfered with in the execution of the orders of this court.

Thereupon the said Graham's executors and others, by counsel, moved the court to permit them to appear as parties defendant in this suit, and to file their answer to the plaintiffs' original and amended and supplemental bills; and then to move and insist that the plaintiffs be required to amend and supplement their bills by making the Virginia and Tennessee

Railroad Company a party defendant in this court. The court denied the motion. The Chief Justice said, in substance: That the rights of Graham's executors were not compromised or put in jeopardy by these proceedings. That this court could dispose of only such estate as legally belonged to the parties of record. That if the plaintiffs, and the principal defendant, the mortgagees and the mortgagor, after being warned by these public proceedings of claims adverse to their title, were still willing to proceed to foreclosure and sale, they were at liberty to do so, if they choose to take the responsibility and run the risk. In reply to a suggestion by counsel that the purchaser might be misled and embarrassed, the Chief Justice said he did not see how that could affect Graham's executors or their rights.

After the judgment of the court was pronounced, HUGHES, J., who was on the bench and heard the argument, though not sitting as one of the court on that question, said: that while he was of opinion that the prayer of this petition asking leave to sue in a state court should be denied, yet he thought that the Virginia and Tennessee Railroad Company, and also the Southside and Norfolk and Petersburg Railroad Companies ought all three to be made defendants. That the grantors in the several divisional deeds exhibited with the plaintiffs' bills were proper, necessary, and indispensable parties, as much so as the grantees in said deeds. That said three companies had rights affected by these proceedings, and they ought to be here to defend them. That the plaintiffs having neglected to make said companies parties, their suit was defective, and not ready for a decree of foreclosure. But inasmuch as his brothers were of a contrary opinion, and had so judicially decided, he would henceforth in this cause, as he was bound to do, consider the point as res adjudicata, and act accordingly.

The next day the representatives of the Dutch bondholders filed a petition, praying that the Virginia and Tennessee, Southside, and Norfolk and Petersburg Railroad Companies might be made parties, upon grounds similar to those insisted upon by Graham's executors the day before. After hearing further argument, the court (consisting of WAITE, C. J., and BOND, J.) adhered to its decision, that the plaintiffs would not be required to make the divisional companies parties.

HUGHES, District Judge. Among my objections to a decree in the present status of the case is the fact that the Virginia and Tennessee Company is not a party defendant to this suit. Various sections of the act of June, 1870, providing for the formation of the Atlantic, Mississippi and Ohio Company, contemplate expressly or impliedly the continued existence, for certain purposes, of the several original companies of which the Atlantic, Mississippi and Ohio was formed, after and not-

withstanding the formation of the consolidated company. One of the sections provides that no shareholder in an original company should be required to subscribe his shares to the stock of the consolidated company. Another section provides that the joint company shall arrange with the divisional companies for the use of their respective roads and properties upon such terms as the latter may agree to "in general meeting." Another provides that the property and franchises of the divisional companies should vest in the general company only as and when it shall absorb the whole of their shares respectively. Another keeps alive the divisional companies for the liquidation of their respective debts as long as the claims of their creditors and shareholders shall remain unsatisfied. Another provides that a separate account of the property, receipts, and expenses of each divisional company shall be kept, for the purpose of protecting the claims and preserving the rights of their respective creditors and shareholders until they are satisfied. In short, I gather from the whole tenor of the act of 1870, that the legislature contemplated a continued separate existence of each divisional company, for certain important purposes, as long as any of the shares of its capital stock were not subscribed to that of the Atlantic, Mississippi and Ohio Company. and as long as any debt which it had contracted remained. Moreover, the act of March 6th, 1872, entitled "An act to complete the organization of the Atlantic, Mississippi and Ohio Company," contemplated the existence of the divisional companies subsequent to the organization of the Atlantic, Mississippi and Ohio Company, and provided a method of extinguishing them by authorizing the condemnation of their stock. It does not appear that anything has been done under the authority given by this act towards extinguishing in the manner which it provides the Virginia and Tennessee Company, and it is a fact of record that that company remains extant as a legal corporation.

But there is nothing of record to show how much of the stock of the divisional companies is outstanding; and it seems to me that this is a matter of sufficient importance to be made the subject of reference to the master commissioner. In order to know, however, with approximate accuracy the state of things in this regard, I have obtained from the secretary of the divisional companies a statement from their books of the number of shares held in them respectively, which have not been subscribed to the Atlantic, Mississippi and Ohio Company. That number is as follows. In the

| | |
|---|---|
| Norfolk and Petersburg Company | 43 shares. |
| Southside Company | 15 " |
| Virginia and Kentucky Company | 605 " |
| Virginia and Tennessee Company | 3398 " |

Leaving out of consideration the three first-named companies, it seems to me that the court would not be justified in ignoring the existence of the Virginia and Tennessee Company, in which there is outstanding stock representing a capital of $340,000. Heretofore it has been possible for the court passively to shut its eyes to the existence of this company, but it can no longer do so; for since the last hearing of this cause a petition has been presented by a portion of the shareholders of this company asking leave to file a bill in a state court (a copy of which is attached to the petition), setting out facts to show its continued existence, and not only impeaching the validity of the organization of the Atlantic, Mississippi and Ohio Company (the defendant in this suit), but attacking as fraudulent the mortgage deed for satisfying which the court is now asked to decree a sale of the railroad which belonged to the Virginia and Tennessee Company. These petitioners are holders of unextinguished stock in a company which the law expressly keeps alive in respect to its debts and to this stock to the amount of several thousands of dollars.

It is a cardinal rule in equity that all persons should be parties to a suit who have an interest in a complete decree settling the title to the subject of the suit and determining all claims upon it; that is to say, it is an imperative rule, that all should be made parties, who, if parties, would be concluded by a complete decree. Our decree in this cause, in order to be complete, must determine the amount of all debts binding the property, and must settle the title of the property as against all claimants. The object of this suit is to procure the sale of a complete title, subject only to the claims of the divisional mortgages. We are to pass a title to the purchaser good against all the world except the lien of the divisional mortgages, and we are to determine the amounts due upon these mortgages. In order to such a decree, it is not only incumbent on us to bring all parties into the cause who have valid claims against this property, but all who have a right in law to litigate these matters, however barren of result that litigation might promise to be. We are to sell a title not only good against successful litigation, but as to which all parties in interest shall be estopped from vexatious litigation. We are not only to sell the property but to settle the title to it.

Among the debts we are ascertaining, by references to a commissioner and by solemn decree, are those of the original Virginia and Tennessee Company; and yet that company, which as to its debts is as certainly in existence as the Atlantic, Mississippi and Ohio Company itself, is not a party to the record. We are determining the debts which it owes in order to a sale of the property which it pledged, without making it a party to the proceeding for sale. What if we should sell to a highest bidder ignorant of the existence of the Virginia and Tennes-

see Company, and of its relations to the railroad sold; and what if that bidder, on hearing the facts of the case, should refuse to comply with the terms of sale because of these facts: would the court compel a compliance? I think it might well hesitate to do so.

In the present status of this cause our decree would not conclude the Virginia and Tennessee Company or its stockholders either as to the title of the Virginia and Tennessee Railroad, or as to the amount due on its divisional mortgages. Such a decree would have still another injurious effect. The act of assembly of March 6th, 1872, authorizing the condemnation and extinction of the stock of the Virginia and Tennessee Company not subscribed to the Atlantic, Mississippi and Ohio Company, was entitled "An act to complete the organization of the Atlantic, Mississippi and Ohio Company." It is an act of the class which are strictly construed. It is an act of which only the Atlantic, Mississippi and Ohio Company can avail itself upon a strict construction of the language of its title, and of the terms of its fifth section. But the sale of the Virginia and Tennessee road by this court will extinguish the Atlantic, Mississippi and Ohio Company, as a corporation; and with its extinction will lapse the right of condemning the outstanding stock of the divisional companies given by this act of 1872. So that our decree, if given in the present stage of this suit, instead of settling the title of the property to be sold, as against the Virginia and Tennessee Company's stockholders, will keep alive that company indefinitely, with power at any time to disturb the title which we sell. Whereas, if the Virginia and Tennessee Company were made a party to the suit, it would be concluded by the decree, and the sale of its property would, by operation of law, ipso facto extinguish that company, as it will extinguish the Atlantic, Mississippi and Ohio Company.

### Final Decree of Foreclosure and for Sale of the Property of Defendants.

This cause came on to be further heard at this term upon the pleadings, and upon the evidence and papers, and master's reports heretofore filed therein, and was argud by counsel; and thereupon the court, upon consideration of the premises, orders, declares, and decrees:

1. That all the reports heretofore made and filed in this cause by the master, as modified by his report, filed on the 30th day of November, 1878, be, and the same are hereby confirmed, except as overruled or modified by this decree, and that the allegations and averments in the complainants' bill of complaint, so far as they are material to the relief prayed for, are true.

2. The court declares and decrees: That the deed of trust executed by the Atlantic, Mississippi and Ohio Railroad Company to Francis Skiddy, William Butler Duncan, and Samuel L. M. Barlow, trustees, complainants in this action, on the 9th day of September, 1871, and of which a true copy is annexed to the master's report, filed in this cause on the 30th November, 1878, to which reference is had, is a valid conveyance of the railroad franchises and property of the said corporation therein mentioned, for the security of the mortgage bonds therein set forth; that the said bonds were duly issued, and the same and the proceeds thereof lawfully disposed of, and dealt with under and according to the statute of the state of Virginia, in that behalf made and provided, approved June 17th, 1870; and that the said deed of trust vested in the complainants, as trustees for the purposes therein mentioned, and according to the tenor thereof, a good and valid title to all and singular the property and franchises therein described, subject only to the liens thereon hereinafter set forth.

3. The court declares and decrees: That the franchises and property conveyed by the said trust deed of September 9th, 1871, to the complainants, trustees, by the Atlantic, Mississippi and Ohio Railroad Company, by way of mortgage, described as near as may be, are as follows; that is to say, all the right, title, and interest of the said Atlantic, Mississippi and Ohio Railroad Company in and to the franchises of the said company, its entire line of railroad then constructed, or thereafter to be constructed; in fact extending from Norfolk, in the state of Virginia, to Cumberland Gap, in the state of Kentucky, together with all branches of the said line of railroad then constructed, or thereafter to be constructed, with the rolls, incomes, rents, issues, and profits thereof, and all real estate, rights of way, easements, fixtures, rolling stock, machinery, tools, and equipments, and all other personal property thereto belonging; and all property, real, personal, and mixed, and all corporate powers and franchises belonging or appertaining to the said Atlantic, Mississippi and Ohio Railroad Company, then possessed by the said company, or thereafter to be acquired by the said company. And for all the purposes of this decree the inventory of the receivers may be referred to for a more full and detailed description of the mortgaged premises. The description also includes all additions to the mortgaged property and premises made or to be made by the receivers; and also all railroad supplies which the receivers may have on hand at the time of sale, or may acquire thereafter before delivery of possession.

4. It is further declared and decreed: That the estate and interest of the complainants in the above-described premises, are, at the date of this decree, subject to the prior liens, stated in the master's report, and here-

inafter more particularly described, and subject to which prior liens, to the extent that they may be outstanding at the time of sale, with interest then accrued on the sums of money secured thereby, the premises must be sold as hereinafter directed.

5. The court declares and decrees: That there was a default on the part of the said corporation in the payment of the instalments of interest upon the said bonds, issued under the trust deed to the complainants, due and payable according to the tenor thereof, on the 1st day of October, 1874, and on the 1st day of April, 1875, and that since the last named date no part of such interest has been paid. That the amount of such interest which has become and remains due and payable, is at the date of this decree, the sum of $1,932,687.75, and that no part of the principal of said bonds has become payable.

6. The court declares and decrees: That of the bonds issued under the trust deed to the complainants, the 474 bonds mentioned in the master's report in this cause, filed on the 30th November, 1878, as delivered to the defendant, the Atlantic, Mississippi and Ohio Railroad Company, by the plaintiffs' trustees, before the appointment of the receivers in this action, and the 5026 bonds deposited by the receivers in the Safe Deposit Company of Baltimore, and the 4030 bonds obtained by the receivers from the Union Bank of London, and deposited with the Safe Deposit Company of Baltimore, all be cancelled by the receivers, and the fact of such cancellation be reported to this court. If for any reasons they shall not cancel the whole number of these bonds, let such reasons be reported.

7. The court declares and decrees: That the amount of indebtedness secured by the trust deed of the Norfolk and Petersburg Railroad Company to George Blood, Jr., and John M. Southgate, dated June 15th, 1857, and bearing interest at eight per cent., payable semi-annually, January 1st and July 1st of each year, is $309,500; that this indebtedness became due and payable on the 1st day of January, 1877; that under the authority of this court the receivers have, by an agreement with the holders, extended the time for the payment of $258,500 thereof, for the period of ten years, from the 1st day of January, 1878, leaving a balance of such indebtedness due and payable of $51,000. The above amount includes two bonds of $500 each, numbered 260 and 296, delivered to the receivers, at the time of their appointment, by the Atlantic, Mississippi and Ohio Railroad Company. That of the amount of the indebtedness secured by the last-mentioned mortgage, bearing interest at seven per cent., payable semi-annually, January 1st and July 1st of each year, there was due on the 1st of January, 1877, $181,500, of which amount the receivers have, by an agreement with the holders, extended the time for pay-

ment, under the authority heretofore conferred upon them by this court in that behalf, of $161,000 for the period of ten years, from the 1st day of January, 1878, leaving of the indebtedness secured by this deed of trust, and bearing seven per cent. interest, due and unpaid, $20,500. The above amount includes 44 bonds of $500 each, delivered to the receivers, at the time of their appointment, by the Atlantic, Mississippi and Ohio Railroad Company, which bonds constitute a part of the mortgaged property.

8. The court declares and decrees: That the amount of the indebtedness secured by the trust deed of the Norfolk and Petersburg Railroad Company, to John S. Tucker, dated September 11th, 1868, and bearing eight per cent. interest, payable semi-annually January 1st and July 1st, of each year, is $500,000, becoming due July 1st, 1893. Included in this amount are two bonds for $1,000 each, which came into the hands of the receivers, and also 40 bonds of $1000 each, which came into the possession of the receivers.

9. The court declares and decrees: That the amount of the indebtedness secured by the trust deed of the Southside Railroad Company, to W. T. Joynes, dated November 15th, 1854, is $1400.

10. The court declares and decrees: That the amount of the indebtedness secured by the trust deed of the Southside Railroad Company, to George W. Bolling (now deceased) and Richard G. Pegram, dated October 19th, 1868, is $1,870,000, of which $709,000 bears interest at the rate of eight per cent. per annum, payable semi-annually, January 1st and July 1st, in each year, and becomes due and payable as follows:

| $100,000 on January 1st | | 1884 |
|---|---|---|
| 100,000 | " " | 1885 |
| 100,000 | " " | 1886 |
| 100,000 | " " | 1887 |
| 100,000 | " " | 1888 |
| 100,000 | " " | 1889 |
| 109,000 | " " | 1890 |

—The bonds representing said indebtedness being known as Southside first preferred eight per cent. bonds.

Included in this sum of $709,000 are bonds to the amount of $56,000, to which the receivers became entitled at the date of their appointment, subject to a lien by way of pledge; but the pledgees, in the exercise of their right so to do, sold $9,000 of the said bonds, applying the proceeds towards the payment of the debt for which they were pledged, leaving $47,000 still outstanding under pledge. This $47,000 is made of the following bonds: numbers 145 to 149, 155 to 158, 204, 427 to 430 inclusive, 151, 207, 212, 216, 219, 222, 238, 239, 249, 251, 255, 270, 431, 298, 144, 142, 143, 277, 289, 291, 299, 300, 399, 433, 434, 444, 446, 447, 448, 450, 482, 485, 498. And of said $1,870,000, $621,000 bears six per cent. interest, payable semi-annually, January 1st and July 1st in each year, and becomes due and payable as follows:

| | | |
|---|---|---|
| $93,000 on January 1st | | 1884 |
| 93,000 " " | | 1885 |
| 93,000 " " | | 1886 |
| 93,000 " " | | 1887 |
| 93,000 " " | | 1888 |
| 93,000 " " | | 1889 |
| 63,000 " " | | 1890 |

—The bonds representing said indebtedness being known as Southside second preferred six per cent. bonds. Included in this, $621,000 are bonds to the amount of $1,000, which the receivers at date of their appointment received from the defendant, the Atlantic, Mississippi and Ohio Railroad Company, and bonds to the amount of $16,700, which the receivers have since redeemed from pledge. This $17,700 is made up of the following bonds: numbers 709, 710, 680, 681, 682, 683, 684, 692, 664, 678, 595, 596, 723, 491, 602, 603, 609, 610, 611, 612, 615, 597, 731, 767, 768, 769, 770, 771, 799, 888, 889, 890, 934, 964, 970, 973, 978, 1162, 1213, 1214, 1216 and 1256 to 1266 inclusive; 729 for $500; 1239, 1234, 1238, 1329, 1330 for $100 each.

Also, included in this $621,000 are bonds to the amount of $22,000, to which the receivers became entitled at the date of their appointment, and which are subject to the lien by way of pledge, hereinafter referred to, the said bonds being in numbers and amount as follows: numbers 686, 687, 688, 689, 690, 695, 696, 697, 698, 699, 701, 702, for $500 each; 478, 479, 480, 481, 482, 489, 490, 582, 592, 703, 704, 705, 706; 1251, 1252, 1326, 1327, 1328, for $100 each—in all, $7,000; 619, 621, 622, 627, 630, 633, 634, 635, 637, 806, 807, 816, 820, 851, 854, 855, 879, 886, 887, 987, 988, and 1274—in all $8,000, and 587 and 593 for $500 each. And of said $1,870,000, $540,000 bears interest at six per cent., payable semi-annually, January 1st and July 1st in each year, and becomes due and payable as follows:

| | | |
|---|---|---|
| $100,000 on January 1st | | 1896 |
| 100,000 " " | | 1897 |
| 100,000 " " | | 1898 |
| 100,000 " " | | 1899 |
| 140,000 " " | | 1900 |

—The bonds representing said indebtedness being known as Southside third preferred six per cent. bonds.

Included in this sum of $540,000 are bonds to the amount of $43,000, which the receivers at the time of their appointment received from the defendant, the Atlantic, Mississippi and Ohio Railroad Company, and bonds to the amount of $6400, which they have since redeemed from pledge, making $49,400 and composed of the following bonds: numbers 717 to 747 inclusive; 764, 794 to 801 inclusive; that is to say, 40 bonds for $300 each—$12,000; 310 bonds, numbers 992, 1007, 1037 to 1049, 1056 to 1250, 1301 to 1400 inclusive, for $100 each—$31,000; 64 bonds, numbers 1005, 1008 to 1020, 1251 to 1300 inclusive, for $100 each—$6400. And also bonds to the amount of $37,800, to which the receivers became entitled at the date of their

appointment, and which are subject to the lien by way of pledge hereinafter referred to, the said bonds being in numbers as follows: 842 to 900, 759 to 762, 765 to 773, 802 to 825, 827 to 841, 786 to 790, 775 to 784.

11. The court declares and decrees: That the amount of the indebtedness secured by the trust deed of the Virginia and Tennessee Railroad Company to Chiswell Dabney, Odin G. Clay, and Abram S. Hewitt, dated December 24th, 1852, bearing semi-annual interest at the rate of six per cent., payable January 1st and July 1st of each year, is $5,000, now due and payable, together with the amount of funded interest secured by the deposit of coupons of bonds of this mortgage, in accordance with the indenture mentioned in the fourteenth paragraph of this decree.

12. The court declares and decrees: That the amount of the indebtedness secured by the trust deed of the Virginia and Tennessee Railroad Company to C. W. Purcell, C. L. Mosby, and C. R. Slaughter, dated January 5th, 1855, bearing interest at the rate of six per cent., payable semi-annually January 1st and July 1st of each year, is $990,000, and the same falls due on the 30th of June, 1884, together with the amount of funded interest secured by the deposit of coupons of bonds of this mortgage in accordance with the indenture mentioned in the fourteenth paragraph of this decree. Also, that the interest at the rate of six per cent. per annum, payable semi-annually on the first day of January and the first day of July of each year, due and to become due upon the preferred stock issued by the Virginia and Tennessee Railroad Company, under and by virtue of the resolution passed by the board of directors of said company the third day of August, 1854, and referred to in the mortgage executed by said company to R. H. Maury, John O. L. Goggin, and Samuel Garland, trustees, dated the fifth day of December, 1855, constitutes a lien upon the property and franchises of said Virginia and Tennessee Railroad Company, next after the lien of the mortgage executed by said company to C. W. Purcell, C. L. Mosby, and C. R. Slaughter, trustees, dated the fifth day of January, 1855. And the court declares and decrees, that the amount of the preferred stock so issued is five hundred and fifty shares of the par value of $100 per share.

13. The court declares and decrees: That the amount of the indebtedness secured by the trust deed of the Virginia and Tennessee Railroad Company to R. H. Maury, Richard Makim, and John Early, dated March 1st, 1866, is $1,000,000, bearing interest at eight per cent., payable semi-annually, January 1st and July 1st of each year, and falling due March 1st, 1900, together with the amount of funded interest secured by the deposit of coupons of bonds of this mortgage in accordance with the indenture mentioned in the fourteenth paragraph of this decree. Included in this sum are bonds to the amount of $37,000, to which the receivers became entitled at the date of their

appointment, subject to a lien by way of pledge, but the pledgees, in the exercise of their right so to do, sold $6,000 of the said bonds, applying the proceeds towards the payment of the debt for which they were pledged, leaving $31,000 still out under pledge, and which are subject to the lien hereinafter referred to. This $31,000 is made up of the following bonds: Numbers 891, 147, 148, 149, 150, 155, 156, 157, 158, 179, 180, 979 to 983, 841 to 850, 882 to 886.

14. The court declares and decrees: That the amount of the indebtedness secured by interest coupons and certificates of interest on preferred stock deposited under the indenture of the Virginia and Tennessee Railroad Company to Decatur H. Miller, dated December 1st, 1869, referred to in the master's report as constituting a lien upon that part of the mortgaged premises heretofore known as the railroad of the said Virginia and Tennessee Railroad Company, of $267,600, heretofore bearing interest at the rate of eight per cent., payable semi-annually, January 1st and July 1st, and falling due July 1st, 1880, constitutes a lien upon the said Virginia and Tennessee Railroad to the extent of the said principal sum of $267,600, with interest thereon at the rate of six per cent. per annum, payable semi-annually as aforesaid. Included in this sum of $267,-600 are bonds to the amount of $700, which the receivers at the time of their appointment received from the defendant, the Atlantic, Mississippi and Ohio Railroad Company, and bonds to the amount of $5,000 which they have since redeemed from pledge, making $5,700, and composed of the following bonds: number 56, for $500; numbers 211 and 220, for $100 each; 212 to 216, inclusive, for $1,000 each. And also bonds to the amount of $35,-000, to which the receivers became entitled at the date of their appointment, which are subject to the lien by way of pledge hereinafter referred to, the said bonds being in numbers and amounts as follows: 217, $1,000; 204 to 211 for $.1000 each; 191 to 203, $1,000 each; 178 to 190, $1,000 each.

15. The court declares and decrees: That the certificates issued by the Virginia and Tennessee Railroad Company, amounting in the aggregate to $84,190.73 in lieu of surrendered mortgage bonds and coupons, and for interest on the preferred stock referred to in the twelfth paragraph, constitute a lien upon the mortgaged premises of the same rank and nature as the bonds and coupons and the interest on the said preferred stock, for which they were given, with interest thereon at the rate of six per cent. per annum, payable semi-annually, the first day of January and the first day of July, until paid.

16. The court declares and decrees: That the amount due in respect of so-called interest funding notes, issued from time to time by the defendant, the Atlantic, Mississippi and Ohio Railroad Company, and secured by a deposit in trust, of the coupons and mortgage bonds, representing such interest, and which coupons still constitute a lien upon the mortgaged premises, according to the tenor of the mortgages made to secure the same, is $134,584, bearing interest at the rate of six per cent. per annum, and due as to principal, as follows:

$3,160 January 1st .................... 1877
131,324 " " .................... 1879

17. The court declares and decrees: That the bonds of the Norfolk and Petersburg Railroad Company, to the amount of $40,000, hereinbefore declared to be subject to a lien thereon; the bonds of the Southside Railroad Company, to the amount of $47,000, hereinbefore declared to be subject to a lien thereon; the bonds of the same company to the amount of $22,000, hereinbefore declared to be subject to a lien thereon; the bonds of the same company to the amount of $37,800, hereinbefore declared to be subject to a lien thereon; the bonds of the Virginia and Tennessee Railroad Company to the amount of $31,000, hereinbefore declared to be subject to a lien thereon, and the bonds of the same company to the amount of $35,000, hereinbefore declared to be subject to a lien thereon, amounting in the aggregate to $212,800, are subject to liens for the payment of $143,800, less such sums as the receivers may have paid, under the authority of the court, towards the extinguishment of such lien.

18. The court declares and decrees: That under and in pursuance of the authority heretofore conferred upon them by the order of this court, the receivers have executed and delivered their certificates for the amount of the aforesaid indebtedness of $143,800, to the end of protecting and preserving for the benefit and advantage of the plaintiffs, the value of the above-mentioned bonds over and above the amount for which they stand pledged, as hereinbefore stated, and the certificates so made and delivered by the said receivers, will, until duly paid, constitute a lien upon the premises mortgaged to the complainants in and by the said trust deed, including the said bonds, superior to the lien of the indebtedness secured or intended to be secured thereby.

19. The court declares and decrees: That the bonds of the Norfolk and Petersburg Railroad Company to the amount of $43,000; that the bonds of the Southside Railroad Company to the amount of $4,000; the bonds of the Virginia and Tennessee Railroad Company to the amount of $488,000, and so-called registered certificates to the amount of $40,517.38, obtained by the receivers, under the order of this court, from Messrs. Duncan, Sherman & Co., and in pursuance of the order of this court, deposited with the Safe Deposit Company of Baltimore, no longer constitute a lien under the respective trust deeds under which such bonds were issued, which can be enforced in any other manner, or to any other extent, than is in that behalf provided by the third article of the trusts, uses, and purposes expressed by the said trust deed of September 9th, 1871, to the complainants, as trustees; that is to say, for the further security of the bonds issued under that trust deed or mort-

gage. and to be held by way of protection to the title of the purchasers of the property and franchises sold under and in pursuance of this decree; to which end the said bonds, after there shall have been put thereon, if there has not been so put already, such proper indorsement restraining their assignability or negotiability, as is provided for by the said third article of said trust deed, shall be delivered over to the purchasers of said property and franchises, at the time of the delivery to them of the deed, to be held by them and their assigns as a protection to their title in accordance with the third clause aforesaid.

20. The court declares and decrees: That the several trust deeds annexed to and forming part of the master's report, filed in this cause on the 30th day of November last past, are true copies of the originals thereof respectively, and that they are severally valid instruments of conveyance according to the tenor thereof.

21. The court declares and decrees: That the mortgage of the Southside Railroad Company to the board of public works of Virginia, to secure an indebtedness to the amount of $800,000, dated February 14th, 1853, delivered over to the president and directors of the Atlantic, Mississippi and Ohio Railroad Company, under the authority of a certain act of the general assembly of Virginia, approved June 17th, 1870, and in pursuance of a so-called covenant of the same date, made in pursuance of the said act, between the Atlantic, Mississippi and Ohio Railroad Company and the said board of public works, was by such transfer and by operation of law extinguished, and no longer constitutes a lien under the said mortgage of the 14th February, 1853.

22. The court declares and decrees: That the mortgage of the Virginia and Tennessee Railroad Company to the board of public works of the state of Virginia, dated March 26th, 1853, made to secure an indebtedness of the said railroad company to the state of Virginia to the amount of $1,000,000, which said mortgage was transferred to the Atlantic, Mississippi and Ohio Railroad Company, under and by virtue of the aforesaid covenant of June 17th, 1870, was extinguished by such transfer, and that the said mortgage and the said indebtedness no longer constitute a lien or incumbrance upon the premises in the said mortgage specified.

23. The court declared and decrees: That under and by virtue of the aforesaid act of the legislature of the state of Virginia, approved June 17th, 1870, and the aforesaid covenant of the said Atlantic, Mississippi and Ohio Railroad Company, made with the board of public works of the said state, and bearing date the day and year last aforesaid, there is now due to the state of Virginia the sum of $3,992,408.87, which indebtedness constitutes a lien upon the premises next after and subordinate to the lien of the said trust deed to the complainants.

24. The court declares and decrees: That the mortgaged premises cannot be sold in parcels without loss and prejudice to all parties interested therein, and that the nature and situation of the property is such that the interest of all parties requires that it should be sold as an entirety.

25. The court orders and decrees: That the receivers in this action sell so many of the aforesaid bonds of the Norfolk and Petersburg, Southside, and Virginia and Tennessee Railroad Companies, respectively redeemed by them from pledge, as it may be necessary for them to sell, in order to raise the amount paid or to be paid by them to redeem such bonds from pledge, with interest on such sum; such sale to be made of such bonds, and at such times, and in such manner, either at private or public sale, as to the receivers may appear to be most judicious and beneficial. All of the bonds of the said last-mentioned companies respectively, not required for such sale and reimbursement, together with such bonds as were surrendered by the defendant company to the receivers at the time of their appointment, as hereinbefore found and stated, the receivers are directed to cancel, and to report such cancellation to the court.

26. The court orders and decrees: That the defendant board of public works, or the defendant the state of Virginia, pay into the registry of this court, on or before the second Tuesday of January next, the amount of the debt ascertained and hereinbefore declared to be due from the defendant company to the complainants' trustees, and such further sum as may become due in the meantime for interest upon the bonds secured by the deed of trust to the complainants, and that, in default thereof, the said board of public works and the state of Virginia shall be forever barred and foreclosed of and from all claim, lien, and equity of redemption, of, in or to, the property and franchises embraced in or covered by the said trust deed of September 9th, 1871, from the Atlantic, Mississippi and Ohio Railroad Company, to the complainants as trustees hereinafter decreed to be sold.

27. The court further orders and decrees: That the defendant, the Atlantic, Mississippi and Ohio Railroad Company, pay into the registry of this court on or before the second Tuesday of January next, the amount ascertained and herein declared to be due by the said company to the complainants, under the said deed of trust, together with the costs in this cause.

28. The court further orders and decrees: That in the event of such payment and redemption as above provided for on the part of the defendant, the Atlantic, Mississippi and Ohio Railroad Company, or on the part of the state of Virginia, or the board of public works, this cause stands continued, with leave to the complainants to apply for appropriate relief in the event of any subsequent default in the payment of interest, and that

in the meantime all proceedings therein be stayed.

29. The court further orders and decrees: That all and singular the property and franchises of every kind described in the third paragraph of this decree be sold by a master hereafter to be specially appointed for that purpose (unless payment be made by the said board of public works, the state of Virginia, or the defendant company, as hereinbefore provided), subject to the amount of the prior liens and incumbrances found and stated in the fourth paragraph of this decree, as the same may exist at the time of sale, and subject also to all executory contracts made by the receivers under the authority of the court, of which the receivers are directed to give to the master, on his request, a full and accurate statement, which contracts, if any, must be publicly announced by the master at the time of sale, and subject, also, to any liability that may be thereafter established against the receivers growing out of any lawful acts done by them in their capacity of receivers, and such liabilities, if any, will remain a lien upon the premises until discharged. Such sale (unless stayed by such payment as provided for in the 26th and 27th paragraphs of this decree) shall be made at some convenient place in the city of Richmond, to be designated by the master. The master shall give notice of the time and place of sale by an advertisement thereof, to be inserted once in each week, for not less than ninety days before the sale, in a newspaper published in each of the cities of Norfolk, Petersburg, Lynchburg, Richmond, and Goodson, in the state of Virginia, and in the city of Baltimore, in the state of Maryland; in the city of Philadelphia, in the state of Pennsylvania; in the city of New York, in the state of New York; in the city of Boston, in the state of Massachusetts; in the city of London, England; and once in each month for the same period in one published in each of the cities of Amsterdam and Groningen, in the kingdom of the Netherlands.

The master shall also serve written notice, to the like effect, upon the attorney-general of the state of Virginia, and the board of public works of the said state, at least ninety days before the sale. The master shall sell the premises herein directed to be sold to the highest and best bidder, and he shall require such bidder, before making an adjudication to him, to pay in cash the sum of $100,000, and if the sale is confirmed by the court, the balance of the purchase-money must be paid within thirty days; but the purchaser shall have the right to anticipate the day of payment. After the payment by the purchaser of such sum in cash as may be sufficient to pay the costs, charges, and expenses of the complainants' trust and of this cause, and the indebtedness of the receivers, and for the payment of the pro rata dividend out of the net proceeds of sale for distribution that may be due to other beneficiaries under the said trust deed, the master may receive from the purchaser in part payment of the purchase-money such interest coupons as may have become due any payable of the bonds secured by the said deed of trust to the complainants, at such rate per centum of the par value thereof as the purchaser would otherwise be entitled to be paid in cash in respect thereof out of the net proceeds of the sale on distribution thereof among the holders of such coupons, and the percentage so applied in satisfaction of the purchase-money shall be treated as a payment of such coupons to the extent of such application. If any question shall arise as to the proportion of the purchase-money that must be paid in cash and the proportion thereof that may be paid in such coupons, application may be made to the court. In case of the failure of any bidder to comply with the terms of sale that are to be complied with on the day of sale, and before a final adjudication to the bidder, the master may reject the bid, and proceed at once, then and there, to make a resale, or he may then and there publicly announce that on some other day, to be then designated, and between certain hours of the day to be designated, he will, at the same place, make a sale of premises under the decree without further advertisement, and he may make the same accordingly. And the master shall have power to adjourn the sale from time to time in like manner for good cause, until a sale shall have been made in accordance with the provisions of this decree. In case of any such adjournment or adjournments, public notice thereof shall be given by publishing a note to the advertisement of sale to that effect, omitting, however, newspapers published in Europe.

30. The court further orders and decrees: That the master report the sale and proceedings under this decree to this court with all convenient speed, and give notice thereof to the complainants' solicitors, and the complainants' solicitors may present the said report to this court on thirty days' notice to the purchaser and the defendants' solicitors. If on presentation and consideration of the said report of sale, which shall be at a stated or special term, sitting in open court, the court shall confirm the sale, the complainants' solicitor must forthwith prepare and submit to the court a draft deed of conveyance from the master to the purchaser; and upon the settlement of the form thereof, and upon due compliance with the terms of sale by the purchaser, the master must execute and deliver such deed of conveyance to the purchaser, and the purchaser, or his successor or successors in interest, will then and thereupon be let into possession of the premises. The purchaser will also and at the same time, be entitled to receive all books, maps, plans, papers, records, and documents of the defendant company, of the said several divisional companies, and relating to all extensions or branch roads of the said com-

panies. and of the receivers, relating and appertaining to the franchises and property in question, and will likewise be entitled to receive, by way of further protection to the title, a transfer of all shares of the capital stock of the Norfolk and Petersburg Railroad Company, the Southside Railroad Company, the Virginia and Tennessee Railroad Company, and the Virginia and Kentucky Railroad Company, respectively, which were owned or held by the Atlantic, Mississippi and Ohio Railroad Company at the time of the filing of the original bill of complaint herein, and the Atlantic, Mississippi and Ohio Railroad Company is hereby directed to transfer over such shares of stock accordingly, and said purchaser will likewise be entitled to receive, by way of further protection to the title, the bonds mentioned in the nineteenth paragraph of this decree; and it is further adjudged and decreed, that by the sale and conveyance to be made as aforesaid of the property and franchises hereinbefore decreed to be sold by said master, the defendants in this action, and each and every of them, including the state of Virginia and the board of public works of said state, and all persons claiming under them, or any of them, subsequently to the commencement of this action, shall be absolutely and forever barred and foreclosed of and from all estate, right, lien, claim. and equity of redemption of, in, or to, or in respect of. said said property and franchises so sold and conveyed, and each and every part thereof.

31. The court further. orders and decrees: That the receivers remain in possession of the mortgaged premises, and continue to operate the line of railroad after the sale, and until the conveyance thereof. They will keep a correct account of the earnings and income of the premises accruing after the date of sale, and if the sale should be confirmed, the purchaser, on delivery of possession by the receivers, will be entitled to receive the net income and earnings accruing subsequent to the date of sale, and the proceeds of such income and earnings.

32. The court further orders and decrees: That the master deposit all moneys coming into his hands under this decree, immediately upon the receipt thereof, in the Planters' National Bank of Richmond, Virginia, to the credit of this cause, to be paid out only in pursuance of the order of this court, and on the motion of, or on notice to, the complainants' solicitors. If the sale shall not be confirmed by the court, the amount of purchase-money paid by the purchaser to be refunded without deduction, unless the non-confirmation thereof shall be due to the fault of the purchaser, in which event such terms will be imposed as the court may think just and proper.

33. The court further orders and decrees: That the proceeds of sale shall be distributed as follows, that is to say: (1) To the payment of the costs and expenses of this cause, and of the execution of the trust on the part of the complainants, and all such fees to counsel as may hereafter be allowed and directed to be paid, and of all of the indebtedness of the receivers. (2) To the payment of the interest coupons, under the mortgage to the complainants, that have become due and payable before the day of sale, and that in computing the sum due in respect of such coupons, interest may be computed thereon, and in case the proceeds of sale shall be insufficient to pay such coupons in full, the same must be paid pro rata and without preference. Such interest coupons must be presented to the master for payment, who will be authorized to pay the same, in whole or in part, as the case may be, when the amount of the proceeds of sale, applicable to such payment, shall have been ascertained. Any surplus that may remain, after the payment of such interest coupons as aforesaid, will remain subject to the further order of the court, and all questions touching such surplus, and the distribution thereof, are reserved.

34. The court further orders and decrees. that all equities among the parties to this suit, all questions of cost, expenses and allowances, and fees of counsel, and all other questions not disposed of, or specially reserved in the foregoing decree, but properly arising under the same, or as proper subjects for further directions, are reserved.